Filed 5/10/13 Gina A. v. Super. Ct. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re DAVID V., a Person Coming Under the Juvenile Court Law. | |
| GINA A. et al.,<br><br>        Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, et al.<br><br>        Real Parties in Interest. | A137820<br><br>(Contra Costa County Super. Ct. No. J11-01065) |

David V. became the subject of concern when it was reported that he was born with methamphetamine in his system in July 2011. Gina A. (Mother) also tested positive for methamphetamine at David's birth. David was detained in foster care while Mother began making efforts to get sober, including residential treatment. Though she regained custody temporarily, Mother relapsed with alcohol in June 2012. Because of her relapse, her lack of insight into her addiction, and her history of treatment and relapse, on January

1

30, 2013, a hearing under Welfare and Institutions Code section 366.26[1] was scheduled for May 22, 2013.

Both parents filed petitions for an extraordinary writ under California Rules of Court, rule 8.452.[2] Mother claims there was insufficient evidence to order removal of David from her care because it had not been shown that returning him to her would pose a substantial danger to his physical or emotional wellbeing and that no reasonable alternative to removal existed. She further argues that the court erred in ordering bypass of reunification services because there was no substantial evidence that she had failed to make reasonable efforts to alleviate or eliminate the conditions that led to termination of reunification services in the dependency case of her older son, Michael A. Finally, she argues the court erred in failing to order reunification services under section 361.5, subdivision (c), because provision of reunification services would have been in David's best interests.

Father, who was incarcerated at the time of the January 30 hearing, argues that his rights under Penal Code section 2625 were violated when the hearing was conducted without his presence due to the county's failure to transport him to court. He further contends the court erred in setting a hearing under section 366.26 without first providing him with visitation or reunification services.

We find the parents' petitions provide no grounds for writ relief and deny both petitions.

## FACTUAL AND PROCEDURAL BACKGROUND

In addition to the exposure to drugs before birth, David was born a month prematurely and suffered from respiratory distress syndrome. As a result he was initially monitored and treated in the neonatal intensive care unit, where Mother visited him regularly. A petition was filed by the Contra Costa County Children and Family Services Bureau (Bureau) on July 22, 2011, alleging David had suffered or was at substantial risk

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] All further references to rules will be to the California Rules of Court.

2

of suffering serious physical harm or illness as a result of Mother's inability to provide him with proper care due to her substance abuse, and further alleging David's half sibling had been abused or neglected, and there was a substantial risk that David, too, would be abused or neglected. (§ 300, subds. (b) & (j).) The petition specifically alleged Mother had a "chronic and serious" substance abuse problem "that spans over a 20 year history" and a history of drug-related arrests and convictions.[3] It further alleged David's half sibling, Michael, had been born with methamphetamine in his system in March 2000, had been removed from Mother's care, reunification services had been terminated, and Michael was then under the guardianship of his maternal grandmother.

Mother initially told the social worker she had been clean of drugs for "years" and had a one-time slip at a party shortly before giving birth to David. In an interview on July 12, 2011, however, Mother and Father "both acknowledged that they have a long history of abusing drugs, incarceration, and arrest history." They both said they were "too old for all the partying they still involve themselves in and that they are ready to make life changes . . . ." Father was nevertheless arrested and jailed a few days later on charges of receiving stolen property and burglary.

On August 3, the Bureau recommended that David be allowed to go home with Mother, with court ordered services. The court disagreed and ordered David detained, with supervised visitation ordered for both Mother and Father. The Bureau was given discretion to release David to Mother after she had achieved 60 days clean, sober, and incident-free in a residential treatment program. Mother entered a 90-day residential program at the Rectory on August 4, 2011. David was released from the hospital into foster care on August 23, 2011.

---

[3] On August 9, 2011, an amended petition was filed adding an allegation that both Mother and David had tested positive for methamphetamine at David's birth. An addendum report prepared for a hearing on August 26, 2011, related that David had not actually tested positive at birth, but because Mother tested positive for amphetamines he was "determined to have been exposed to drugs before birth."

On September 2, 2011, Mother pleaded no contest to an amended allegation under section 300, subdivision (b), namely that David was "at risk of suffering serious physical harm in that the mother has a serious substance abuse problem that inhibits her ability to care for the child."  The allegation under subdivision (j) was dismissed.

In the disposition report, Mother's criminal background was spelled out more fully, including drug-related arrests and convictions spanning the period 1987 through 2011: possession of drug paraphernalia, vandalism, theft, burglary, possession of controlled substances, forgery, carrying concealed weapons, carrying a loaded firearm, battery, willful cruelty to a child, auto theft, DUI, and parole violations.  These included an arrest for controlled substance possession on January 13, 2011 (i.e., while she was pregnant with David).

At the disposition hearing on October 5, 2011, with Father present, the detention order of August 3 was vacated and David was returned to Mother's care while she remained in the Rectory treatment facility.  Family maintenance services were ordered for Mother, so long as she refrained from drug and alcohol use, completed an inpatient and outpatient drug treatment program, attended 12-step meetings, randomly tested negative for drugs, participated in parenting classes, and lived with David's maternal grandmother after completing her inpatient drug treatment program.

Father was also declared David's presumed father on October 5, 2011.  Visitation with Father was found to be detrimental to David due to his prematurity and compromised health, and no visitation was ordered.

On March 21, 2012, at a six-month review under section 364, Mother and David were living with David's maternal grandmother, and Mother was reported to have successfully completed the residential portion of the drug treatment program.  Mother, however, was not in an outpatient program, although she was attending AA and NA meetings.  Family maintenance services were continued for Mother, with a 12-month review hearing set for September 12, 2012.  Even as of March, the social worker expressed concern that Mother was not fully committed to recovery, and the court made

4

clear that in the event of a future relapse, the Bureau was encouraged to file a supplemental petition.

On July 19, 2012, the Bureau filed a supplemental petition (§ 387) alleging that on or about June 14, 2012, Mother tested positive for alcohol. There had also been nine tests beginning in April 2012 that were compromised because creatinine levels were too low to provide reliable results, which could suggest Mother had intentionally diluted the tests. Mother denied drinking alcohol and said the positive test must have been the result of putting vanilla extract in her coffee. She also claimed to be ignorant that it was possible to dilute a drug test so as to make its results invalid.

David was again ordered detained on July 20, 2012. The report prepared for that hearing indicated that the maternal grandmother was willing and able to serve as a placement for David. However, not all residents of the grandmother's home had completed the paperwork necessary to have the home approved. The social worker was somewhat skeptical of placing David with the grandmother because on one home visit there was a drunken relative (Mother's brother) minding the children. David therefore was detained in two different foster care homes from July 20, 2012, through the hearing on January 30, 2013.

On August 31, 2012, Mother pleaded no contest to the supplemental petition, and the court sustained it. Mother presented documentary evidence showing she had frequently attended 12-step meetings. She had enrolled in an outpatient drug program on April 12, 2012 and transitioned into a residential treatment program on August 27, 2012.

The court set October 5, 2012, for a contested dispositional hearing, which was continued to December 10, 2012. Although an order was issued to have Father transported for the December 10 hearing, he was not transported because he was awaiting sentencing, and Santa Rita Jail would not release him. The hearing was therefore continued to January 16, 2013. On December 19, 2012, it was again continued to January 30, 2013, because Father was scheduled to be sentenced on January 17. County counsel announced she would seek to go forward with the hearing on January 30, even if

5

Father were not present. An order was issued to secure his transportation from jail for the January 30 hearing.

On January 30, 2013, when Father again was not transported to the hearing, Father's counsel requested another continuance. County counsel objected to a further continuance, arguing that because the matter being adjudicated was a supplemental petition under section 387, Father did not have an absolute right to be present. The court denied a continuance, and the hearing went forward.

Mother testified she entered the Rectory residential substance abuse recovery program in August 2011 and completed the program in December 2011, which included a voluntary one-month extension beyond the usual 90-day program. At three months of age, David was placed in her care while she was in the residential program. She claimed she had clean test results from December 2011 to April 2012, when she entered an aftercare program at Ujima West in Richmond. Her social worker testified, however, that she did not complete intake for drug testing until March 13, 2012.

Mother admitted relapsing with alcohol for the entire month of June 2012, while David was in her care. She testified that her relapse consisted of drinking wine occasionally—one to "a couple" of glasses about once a week. She did not use any illegal drugs during her relapse. She admitted she had previously lied in explaining the positive test was due to adding vanilla extract to her coffee. She had not admitted the vanilla extract story was a lie until she appeared in court. She could not explain her relapse except to say that she had become "complacent" and was probably just substituting one substance for another. She testified that she was never "falling down drunk" as a result of her relapse and was never unable to care for David during that time. She stopped drinking when she learned that David was again being detained.

Mother denied deliberately diluting the invalid test results that were produced from April to June 2012. She claimed she did not know about the possibility of diluting test results until she was confronted with the invalid test results in July 2012.

Mother admitted she had been a substance abuser for "at least 16 years" , and ultimately admitted she had used marijuana since age 12, alcohol since age 16, and

6

methamphetamines since she was 18. She claimed, however, that her use of illegal substances had not been continuous over the years.

In late August 2012, after David was detained on the supplemental petition, Mother transitioned from the Ujima West outpatient program to a residential program; she was still in the residential program at the time of the January 30 hearing. She had participated satisfactorily and was reported to be a "role model to other residents." Mother also had undergone nine random drug tests between August 30, 2012 and November 19, 2012, with negative results. She anticipated graduating from the program on February 24, 2013, but she planned to stay on longer. She testified and submitted documents showing she had attended 12-step meetings (NA and AA) regularly , and she submitted a letter of support from the therapist at the residential drug program. She also had secured transitional housing in anticipation of graduating from the program. The housing program provided drug treatment support and meetings, as well as parenting education classes.

Mother acknowledged her previous involvement with the Bureau in relation to Michael's case. She admitted being an addict at that time and losing custody of Michael, but she claimed this time it was different because she had greater willingness to work on recovery and truly wanted to begin living a different way of life.

The court asked her which of the 12 steps she was currently working on, and she replied that she was still on step one. She said it had taken her "a while" to admit she was powerless over her addiction. She also told the court that relapse is a part of recovery.

Mother testified she had never missed any visits with David and they interacted well together. David recognized her as Mommy and became sad when their visits drew to an end. In fact, by all accounts, Mother's relationship with David was a good one and she interacted with him appropriately. The social worker herself observed that Mother was "loving and appropriate in play and conversation with the child."

Father wrote a letter to the court dated November 12, 2012, in which he expressed the wish, after he completed his sentence, to have his family reunited.

7

Called by Mother's counsel, the social worker, Sonja Ritter, then testified, expressing concern that Mother still did not have insight into her "triggers" to drink or do drugs. Ritter felt that Mother was simply "going through the motions" in recovery and found success in drug treatment only while she was in a structured environment. She testified that Mother had not been able to admit she has a substance abuse problem. Ritter had never before the hearing heard Mother admit she had a drug problem prior to her testifying in court. Ritter admitted that the inconclusive drug tests performed in April to June of 2012 had not been brought to Mother's attention as they occurred.

At the close of evidence, counsel for the Bureau argued against reunification services for Mother because she had failed to make reasonable efforts to remedy her substance abuse issues. County counsel argued further that David was very young and needed permanency. Counsel urged the court to set a section 366.26 hearing.

Mother's counsel argued that David should not be removed because her relapse with alcohol did not show David was at risk in her care. Counsel further argued she should be granted reunification services because she had made reasonable efforts to address her substance abuse issues. She argued denial of reunification services on the basis of the brief period relapse with alcohol was inappropriate in the absence of a showing that it adversely affected her parenting ability. She also argued that Mother had substantially complied with her case plan, and a parent in her circumstances was not required to be an ideal parent.

Father's counsel supported Mother's position on behalf of his client. Father's attorney represented to the court that it was Father's wish for Mother to get into "real recovery"—and Father's counsel suggested she had done so—and for her to receive custody of David.

David's counsel called this a "borderline" case, praised Mother for her recent efforts at sobriety, and stated she did not oppose reunification services for Mother due to "the child's bond with his mother."

The court agreed this was a "fairly close case" in light of Mother's most recent recovery efforts. The court clarified, however, that under section 361.5,

subdivision (b)(10), it could consider all of Mother's efforts from the removal of Michael to the present time in assessing her "reasonable efforts" to address her drug problem. The court noted that Mother's recent efforts at recovery had to be taken with a "pinch of salt" because parents in dependency proceedings comply with their programs "pretty much at the point of a gun" and simply "go through the motions for the most part." The court noted its job was to "discern which are the genuine cases and which are not."

The court relied in part on Mother's failure to admit she lied about her relapse up until the hearing. Based on the lie about the vanilla extract, the court found Mother's explanation for the diluted tests was also false, implicitly finding she intentionally avoided giving legitimate tests during that time. And while some people in recovery "never get past the first step," the court warned that time was "not a luxury that [David] has while his mother gets her life together." The court found that returning David to Mother's care would create a substantial danger to David's physical health (§ 361, subd. (c)(1)) and further found that Father was incarcerated and had left David without provision (§ 361, subd. (c)(5)). It ordered family maintenance services to Mother terminated, ordered reunification services to Mother bypassed under section 361.5, subdivision (b)(10), and set the matter for a hearing under section 366.26 on May 22, 2013.

Father's status was changed from presumed father to alleged natural father. The court found that providing reunification services to Father would not benefit David and would be detrimental to him. The court ordered supervised visits for both Mother and Father (after his release from custody).

Both parents filed timely notices of intent to file a petition for extraordinary writ pursuant to rule 8.450, followed by such petitions under rule 8.452.

## DISCUSSION

### *Sufficiency of evidence of danger to David's wellbeing*

**Substantial evidence of danger to David's wellbeing**

Before ordering David removed from Mother's custody, the trial court was required to find, and found, by clear and convincing evidence that there would be a

9

substantial danger to David's physical or emotional wellbeing by not removing him and there were no other reasonable means by which his physical health could be protected. (§ 361, subd. (c)(1); *In re Henry V.* (2004) 119 Cal.App.4th 522, 525, 528-529.)  But, as Mother concedes, the standard of review is whether there was substantial evidence to support the court's findings and orders**.**  (*Kimberly R. v. Superior Court* (2002) 96 Cal.App.4th 1067, 1078.)  However, we assess the presence or absence of substantial evidence with the clear and convincing standard in mind.  (*In re Henry V.*, *supra*, at p. 529; *In re Alvin R.* (2003) 108 Cal.App.4th 962, 971; *In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1654.)

There was substantial evidence to support the court's finding.  Mother had a long history of drug abuse and had previously exhibited a pattern of entering treatment, doing well while in a structured environment, and then relapsing after she returned to living outside the treatment environment.  She lost custody of Michael as a result of that pattern. She continued to exhibit the same pattern with David, having consumed methamphetamines during pregnancy.

Indeed, in Michael's dependency we see a familiar pattern.  As with David, the Bureau had been involved with Michael since his birth, when he tested positive for amphetamines.  Mother received family maintenance services and the case was closed in October 2000.  In May 2001, however, the Bureau received information that Michael had ingested methamphetamines.  Michael was removed from Mother's care on May 19, 2001 (at age 14 months).  He was placed in foster care but returned to Mother on June 7, 2001.  After Mother was arrested on June 26, 2001 for child endangerment, Michael was again placed in foster care, with reunification services provided beginning August 1, 2001. In May 2002, Michael was again placed with Mother, with family maintenance services, but after she continued to relapse, he was again removed from her care in April 2003 via section 387 petition.  Reunification services were denied on August 6, 2003.  In April 2007 Michael was placed under the guardianship of his maternal grandmother.

In December 2011, after David was detained, Mother did successfully complete residential treatment, but once she left the program she delayed until March 13, 2012 to sign up for drug testing and until April 12 to sign up for an outpatient program. She then produced a series of invalid test results and finally tested positive for alcohol. She first denied she had consumed alcohol, lying about how the positive test had come about.

She then again entered residential treatment in August 2012 (after David was again detained) and was doing well, but she continued to lie about her alcohol relapse. Even at the hearing she seemed to minimize her alcohol consumption during relapse. And although she attended 12-step meetings regularly, she was still on the first step, which involves admitting one's own addiction. Thus, relapse was a distinct possibility for Mother.

We are aware that a parent need not be perfect to regain custody of a detained child. (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789-790.) But in the context of a persistent, long-term addiction, relapse—especially without prompt acknowledgment—is a significant factor supporting the juvenile court's rulings.

Mother claims, however, that finding her likely to relapse would not be enough to find David would be in danger in her care. She argues there must be a proven link between the potential for relapse and the danger posed to the child. But in cases involving children of tender years, a finding of substance abuse is prima facie evidence of the parent's inability to provide regular care, resulting in a substantial risk of physical harm. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766-767.)

Because her addiction previously led to numerous arrests and convictions, it is fair to say Mother's judgment is impaired when she uses drugs. Her drug problem is serious enough that Michael was placed in a guardianship. Indeed, the record shows that Michael had to be taken to the hospital at 14 months of age because he ingested methamphetamines. These facts tend to show that Mother's active drug use does affect her parenting skills, including that she was unable to protect Michael from the accidental ingestion of a dangerous illegal substance.

11

And despite her experiences with Michael, Mother took methamphetamines while she was pregnant with David, which further supports an inference that her judgment was impaired and that she was incapable of placing her child's safety ahead of her own addictive needs. Given the history of Mother's drug-related neglect of Michael, there was substantial evidence to support a finding that David's well being would be in danger if he were left in her care.

*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322 does not convince us the juvenile court erred. In that case the court held occasional use of alcohol and marijuana during reunification does not necessarily bar a child's returning home where there is no evidence to connect the use of such substances with the reasons for the child's removal. The children, ages seven and a half and three at the time of the hearing, were taken from their mother's custody because she left them alone in a motel room while she went to work. (*Id*. at pp. 1326-1327.) She quickly accepted responsibility for her lapse in judgment and substantially complied with the provisions of her case plan. (*Id*. at pp. 1326, 1330.) The relationship between the mother and the two children was warm and parental. (*Id.* at p. 1327.) The mother's only failing was that she tested positive for alcohol in one random test, and twice tested positive for marijuana. (*Ibid*.) It had never been alleged or substantiated that the mother had a drug abuse problem: she was never subjected to "clinical evaluation and was never diagnosed as having a substance abuse problem." (*Ibid*.) The Court of Appeal found significant the lack of evidence that substance or alcohol abuse was related to leaving the children at the motel. (*Ibid*.) The court held the trial court's finding was not supported by substantial evidence. (*Id*. at p. 1326.)

Our case is dramatically different in that Mother had an extensive drug abuse problem from early adolescence onward. She first experimented with marijuana at age 12, was "an alcoholic" by age 16, and began using methamphetamine at age 18. She was 43 years old at the time of the hearing, meaning that her problem with drugs and alcohol had extended over a period of approximately 30 years. A positive alcohol test, with the attendant circumstances of lying and minimizing, was a sufficient basis for concluding

12

that the risk of harm to David remained. The multiple invalid tests submitted before the positive one added weight to the evidence supporting the court's findings and orders.

The fact that David was involved with the Bureau as a newborn also distinguishes our case from *Jennifer A.* and others involving older children with well-established bonds to their parents. Not only is such a young child particularly dependent upon a parent and especially vulnerable to lapses in parental care, but the dependency system is designed to take such age differences into account, for instance, in designating different periods of reunification depending on the child's age at detention. (§ 361.5, subd. (a)(1)(A) & (a)(1)(B).) A child so young, who has not yet developed a deep bond with his or her parent, is more likely to be well-served by turning attention more quickly to permanence as the goal.

Mother also relies upon *In re David M.* (2005) 134 Cal.App.4th 822, which is also a far different case involving the dependency of two children, David M. and a younger brother A.M. True, there are some similarities between our case and *David M.* in that the mother in *David M.* tested positive at A.M.'s birth for marijuana use within the past three weeks. (*Id.* at pp. 825, 827.) However, there were other factors that led the court in *David M.* to conclude that jurisdiction had improperly been asserted over the children. Foremost, mother and father were raising an older child together (David M.) and provided him with a "clean, tidy home," and he was "healthy, well cared for, and loved." (*Id.* at p. 830.) An older half sibling had been removed from the mother's care but primarily due to her incarceration at the time of his birth, with no ability to provide for him, and because of mental health issues: she was "delusional, and . . . impaired due to her long history of marijuana use." (*Id.* at p. 826.) By the time the petition was heard in David M.'s and A.M.'s case, the record established only that the mother had a marijuana problem in a "limited respect." (*Id.* at p. 830.)

The Court of Appeal was clearly disturbed that an updated investigation had not been conducted after A.M. was born, which was some four years after the older half sibling had been removed. (*David M., supra*, 134 Cal.App.4th at pp. 825, 830-831.) Instead, the agency relied on the investigation conducted for the older half sibling. (*Id.* at

13

p. 831.)  In the meantime mother and father, who met in a sober living home after the older half sibling had been taken from mother, had by all appearances successfully parented David M., with a family support system that included attentive godparents, appropriate medical care, and " 'a clean home and a supportive family.' " (*Id.* at pp. 826-827.)  Moreover, the father in *David M.*, while apparently unable to work due to an anxiety disorder and depression, had not been shown to be involved with any drugs and had not been shown to be impaired by his mental health in caring for David.  (*Id.* at p. 827.)

The Court of Appeal was also concerned about the social services agency's rush to judgment against the mother based on the earlier half sibling's dependency.  According to the opinion, the agency relied solely on the years-old investigation in recommending a bypass of reunification services and asking that a hearing be set under section 366.26.  (*David M.*, *supra*, 134 Cal.App.4th at p. 831.)  The agency, it seems, had "determined that mother was a lost cause, and simply gave up on her."  (*Ibid.*)

Our case is different in that Mother had not successfully parented a sibling between Michael's dependency and David's birth.  Indeed, she seemed to have learned nothing from the prior dependency, testing positive once again for methamphetamines when David was born.  We note the drug in question is a very destructive one,[4] more serious than the marijuana involved in *David M.*, which is the only drug mentioned in the opinion.  And the presence of the father in the home in *David M.* appears to be a distinguishing factor that was not present in the case before us because of Father's incarceration.

Finally, in *David M.* the proof relating to the prior dependency of the half sibling was limited to the sustained jurisdictional petition; the agency "did not offer in evidence any other portion of [the older half sibling's] case file," nor did it request judicial notice of the rest of the case file.  (*David M.*, *supra*, 134 Cal.App.4th at p. 832.)  Therefore the

---

[4] Still, we place no significance on the social worker's speculation that Mother's methamphetamine use "presumably incited" David's premature birth and associated health problems, as it seems to have no medical support.

Court of Appeal could not tell "[w]hat services were offered, and what were the circumstances of mother's apparent failure to fulfill her case plan and reunify" with her older child. (*Ibid.*) In the present case, the record of Michael's dependency was put before the court, including records of family maintenance efforts and the reasons for Mother's failure in the first dependency. The record also shows that family maintenance services were offered to Mother in the present case, but she was unable to remain sober when out of residential treatment.

The juvenile court could properly conclude that Mother had a serious drug abuse problem that she had failed to come to grips with after many years. The fact that Mother was still on step one in her 12-step work suggests she had not made significant progress in recovery despite recent attempts. The court specifically found Mother was just "going through the motions" of recovery because she was in her programs, in effect, "at the point of a gun." The finding of danger to David was supported by substantial evidence.

**Substantial evidence of lack of alternatives to removal**

Mother also contends there was no substantial evidence to support the court's finding that no alternative to removal existed. Mother suggests long-term residence in a structured environment providing drug treatment would have been a reasonable alternative to removal.

As we understand Mother's testimony, she had arranged for transitional housing at Shelter Inc., which would have been such a supportive environment. Mother testified that a case manager at Shelter Inc. would have been assigned to continue helping her with the transition for up to two years.

The court could reasonably view that arrangement as an unsatisfactory solution. It was not clear from Mother's testimony how long she and David could actually remain housed at Shelter Inc. Mother had demonstrated by past example that once she was released from residential treatment she tended to resist outpatient support and ultimately to relapse. A parent cannot expect to reside in a drug treatment environment for the rest of her child-rearing life. The court's finding on lack of reasonable alternatives was supported by substantial evidence.

15

*Sufficiency of evidence of Mother's failure to make reasonable efforts to alleviate risk under section 361.5, subdivision (b)(10)*

Mother also argues the court erred in ordering a bypass of reunification services because there was insufficient evidence that she failed to make "reasonable efforts" to alleviate the conditions that led to the removal of Michael from her care.  The juvenile court found by clear and convincing evidence that the exemption of  reunification services found in section 361.5, subdivision (b)(10) applied and therefore denied reunification services to Mother.  That section provides in substance that, if a parent has had another sibling or half sibling of the child removed from his or her care, and if he or she failed to reunify with the sibling so that reunification services were terminated, then the court may bypass reunification services for the child before it if the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian."[5]  (§ 361.5, subd (b)(10).)

The statute is less than artfully worded. (See fn. 5, *ante*.)  But the courts have concluded that a two-prong analysis is called for: (1) were reunification services terminated as to a sibling? and (2) has the parent subsequently failed to make reasonable efforts to treat the problems that led to the removal of the sibling?  (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96 (*Cheryl P.*); but see *In re Gabriel K.* (2012)

---

[5] Section 361.5, subdivision (b)(10), provides as follows:

"(b) Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . .[¶]

"(10) That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian."

203 Cal.App.4th 188, 194 [using a four-part analysis].)  We review the juvenile court's order for substantial evidence.  (*Cheryl P., supra*, 139 Cal.App.4th at p. 96.)

Mother concedes that Michael was previously removed from her care and reunification services were terminated.  The same problem that led to the dependency of Michael (i.e., Mother's substance abuse) also led the court to detain and remove David from Mother's care.

Mother emphasizes that the Bureau failed to prove the second prong of the test—that she has not made reasonable efforts to remedy the problem.  She insists the analysis must focus on her efforts, not the success or failure of the efforts.  (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914 (*R.T.*); *K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, 1393; *Cheryl P., supra*, 139 Cal.App.4th at p. 99; *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464.)  Progress (or lack thereof), however, may undeniably be considered: "It is certainly appropriate for the juvenile court to consider the *duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the focus of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made."  (*R.T., supra,* at pp. 914-915.)

The court found Mother had made "little progress" in achieving sobriety. Considering the length of time Mother has had a drug abuse problem and the earlier dependency of Michael, that finding was supported by substantial evidence.  She initially showed inconsistent willingness to face up to the fact, let alone the severity, of her addiction.  Early in David's dependency proceedings Mother claimed she had been "drug free for 21 years" and her positive drug test at David's delivery "was a result of breathing in smoke while socializing with others who were indulging in methamphetamine use."

It is true that Mother voluntarily went into a residential treatment facility shortly after David was detained.  She also went into residential rehab after David was detained on the supplemental section 387 petition in July 2012.  She attended 12-step meetings

17

faithfully, having documented attendance in at least 139 meetings over the course of approximately five months. In addition to submitting evidence of her attendance at 12-step meetings, Mother submitted reports from her programs attesting to her progress in recovery, as well as certificates of achievement in recovery.

The question arises, however, on what time period we are to focus when we consider whether Mother has "subsequently" made reasonable efforts. *Cheryl P.*, *supra*, 139 Cal.App.4th at page 98, construed the term "subsequently" to "refer[] to reasonable efforts made since the *removal* of the sibling." (Italics added.) The statute could also be read as applying to efforts made during the period following the *termination* of reunification services in the prior dependency. (See *In re Harmony B.* (2005) 125 Cal.App.4th 831, 842-843.) Either way, the statute clearly must be construed as calling for a consideration of not merely Mother's efforts to alleviate her drug problem *after* David's detention, but what she did during the period between Michael's dependency and David's birth. (§ 361.5, subd. (b)(10).) In this case that is a lengthy period (eight years from termination of reunification services with Michael) with no evidence of efforts by Mother to address her addiction except those prescribed for her during dependency proceedings. (Cf. *In re Harmony B.*, *supra*, at pp. 842-843.)

Although Mother entered programs as required by the Bureau during both dependency proceedings, she showed no meaningful efforts to maintain sobriety of her own volition once she was in an unsupervised environment. It may be inferred she made little effort after her reunification services with Michael had been terminated because she exposed David to methamphetamines before his birth. Thus, even when she was pregnant, we see no effort by Mother to stop using drugs. And Mother herself testified she had been in treatment programs just three times: once during Michael's dependency and twice during David's.

In the current dependency, Mother was slow to register for required outpatient treatment and drug testing after leaving the Rectory residential program. She turned in a string of suspiciously inconclusive tests, followed by a positive test for alcohol. There is reason to suspect she was drinking more than she acknowledged in court, when she

18

finally abandoned the "vanilla extract in my coffee" story and admitted she had relapsed with alcohol. The social worker concluded that Mother lacked insight into her addiction and could not identify what "trigger[ed]" her to relapse. The court noted that after more than a year of 12-step meetings, Mother was still on the first step—acknowledging that she is an addict and is powerless over drugs and alcohol. We also consider whether Mother voluntarily checked herself into rehab at any time that was not preceded by detention of one of her children. Based on the record we see no such self-motivated efforts at rehabilitation.

The foregoing facts constitute substantial evidence that Mother's efforts to alleviate the problem that led to Michael's removal had not been "reasonable." Given the timeframe available to her for improvement, Mother's progress had been minimal and spotty. She continued to relapse when not actively involved in a residential treatment program. And she went into residential treatment only when loss of a child appeared imminent. In Mother's case, what constitutes "reasonable" efforts may justly be affected to some extent by the outcome of those efforts. (*R.T.*, *supra*, 202 Cal.App.4th at pp. 914-915.) The court's decision to bypass reunification services was supported by substantial evidence.

### *Whether ordering reunification services was in David's best interests under section 361.5, subdivision (c)*

Mother's final claim is that the court erred in denying reunification services because reunification was in David's best interests within the meaning of section 361.5, subdivision (c). As Mother points out, section 361.5, subdivision (b)(10) does not invariably require denial of reunification services, but to say (as she does) that it merely authorizes such denial is a bit misleading. Subdivision (c) specifically provides that the court "shall not order reunification for a parent or guardian described in paragraph . . . (10) . . . of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." This provision is a burden-shifting one. "Thus, ' "[o]nce it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that

19

offering services would be an unwise use of governmental resources. [Citation.]" '
(*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744.) The burden is on the parent to
change that assumption and show that reunification would serve the best interests of the
child." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1227 (*William B.*).)

"A juvenile court has broad discretion when determining whether further
reunification services would be in the best interests of the child under Welf. & Inst. Code,
§ 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination
only if the juvenile court abuses its discretion." (*William B., supra*, 163 Cal.App.4th at
p. 1229; accord, *Cheryl P., supra*, 139 Cal.App.4th at p. 96, fn. 6; *In re Angelique C.*
(2003) 113 Cal.App.4th 509, 523-524.)

Mother asserts there was no explicit finding by the court that it would not be in
David's best interest to have reunification services provided. Mother asks us to consider
such a finding implied in the record. But since the burden is on the parent to establish the
exception provided in section 361.5, subdivision (c), it is the parent's burden to request
such a finding if the parent deems that subdivision applicable. The Bureau points to the
lack of a finding as demonstrating Mother's failure to raise the issue below, and her
consequent waiver of it. (*In re Anthony P.* (1995) 39 Cal.App.4th 635, 641.) We agree
with the Bureau that the issue has been forfeited.

But even if we were to address the issue on the merits, we would find no abuse of
discretion. It is true that David and Mother had a close relationship, and David's counsel
did not oppose reunification efforts. However, the closeness of the relationship alone is
no reason to conclude that the provision of reunification services would be in the child's
best interest. (*William B., supra*, 163 Cal.App.4th at p. 1229.) "The best interests of the
child are not served by merely postponing his chance for stability and continuity and
subjecting him to another failed placement with the parent." (*Ibid.*)

Rather, the "juvenile court should consider 'a parent's current efforts and fitness
as well as the parent's history'; '[t]he gravity of the problem that led to the dependency';
the strength of the bonds between the child and the parent and between the child and the
caretaker; and 'the child's need for stability and continuity.' " (*William B., supra*,

20

163 Cal.App.4th at p. 1228, quoting *In re Ethan N.* (2004) 122 Cal.App.4th 55, 66–67.) In addition, "at least part of the best interest analysis must be a finding that further reunification services have a likelihood of success. In other words, there must be some 'reasonable basis to conclude' that reunification is possible before services are offered to a parent who need not be provided them. (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464.)" (*William B.*, *supra*, at pp. 1228-1229.)

Considering all of the foregoing factors, we find no abuse of discretion in the court's denial of reunification services. David was 18 months old at the time of the contested hearing. He had spent virtually his whole life in the dependency system. His need for stability and continuity was profound and pressing.

Mother's history with drugs has been reviewed. There can be no serious argument that her problem was not grave. Substance abuse is notoriously difficult for a parent to overcome, even when faced with the loss of her children. (See *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9.) Mother's history demonstrated such a difficulty. She had been involved in substance abuse since she was 12 years old. She lost custody of one son due to methamphetamine abuse. As in *William B.*, she "then repeatedly failed to overcome her drug addiction despite years of reunification services and effort on her part. Any significant periods of sobriety were achieved only while under SSA's supervision. When that support was no longer available, the mother quickly relapsed." (*William B.*, *supra*, 163 Cal.App.4th at p. 1228.) Because of the protracted nature of Mother's problem, her history of failed treatment with Michael, and her relapse without self-reporting during the current dependency, the court was justified in concluding that reunification efforts would not likely be successful and that it was time to start focusing on stability and permanency for David.

### *Failure to transport Father to hearing*

Father contends the court erred in conducting the hearing on January 30, 2013 in his absence and over his attorney's objection. He relies principally on Penal Code section 2625, which provides in pertinent part, as follows: "(d) . . .*[N]o petition to adjudge the child of a prisoner a dependent child of the court pursuant to subdivision (a),*

21

*(b), (c), (d), (e), (f), (i), or (j) of Section 300 of the Welfare and Institutions Code may be adjudicated without the physical presence of the prisoner* or the prisoner's attorney,[6] unless the court has before it a knowing waiver of the right of physical presence signed by the prisoner or an affidavit signed by the warden, superintendent, or other person in charge of the institution, or his or her designated representative stating that the prisoner has, by express statement or action, indicated an intent not to appear at the proceeding. [¶] (e) In *any other action or proceeding* in which *a prisoner's parental* or marital *rights are subject to adjudication,* an order for the prisoner's temporary removal from the institution and for the prisoner's production before the court *may* be made by the superior court of the county in which the action or proceeding is pending, or by a judge thereof. . . ." (Italics added.)

Father further argues that rule 5.530(f)(2) and (f)(4) make the prisoner's presence mandatory at "any jurisdictional hearing held under section 355 or dispositional hearing held under section 358 or 361, and any permanency planning hearing held under section 366.26 in which termination of parental rights is at issue."[7] Rule 5.530(f)(2) requires that a removal order be issued in such circumstances, and rule 5.530(f)(4) provides that "No hearing described in (2) may be held without the physical presence of the incarcerated parent and the parent's attorney."

The Bureau argued in the juvenile court that, since a supplemental petition to remove a child to foster care under section 387 constitutes a modification of a preexisting order adjudicating the child a dependent child, it is not one in which the prisoner's presence is specifically guaranteed under rule 5.530 and Penal Code section 2625. The Bureau does not reassert that argument in this court, and we need not resolve the issue

---

[6] *In re Jesusa V.* (2004) 32 Cal.4th 588, 622, construed the phrase "without the physical presence of the prisoner or ' "the prisoner's attorney" ' " in Penal Code section 2625, subdivision (d) (italicized above) to mean that both the prisoner and his attorney must be present in section 300 adjudication proceedings.

[7] "For any other hearing in a dependency proceeding, including but not limited to a detention hearing or a review hearing, the court *may* order" the prisoner produced for the hearing. (Rule 5.530(f)(3), italics added.)

because we find other reasons to reject Father's argument that the order of January 30, 2013 must be set aside.

First, Father complains not only about his absence at the hearing on January 30, 2013, but also about his absence at prior hearings. He was, however, represented by counsel at those hearings.[8] He has not produced a record of those proceedings from which we may discern whether his counsel objected to proceeding in his absence. Moreover, we note that he did not appeal from any orders prior to January 30, 2013, and has therefore waived any claim they were held in violation of the aforesaid authorities. (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1151-1152.)

Fundamentally, there are competing interests at stake, specifically the child's interest in prompt adjudication of his custody status. Those interests are articulated by a statutory requirement under section 352 that continuances in child dependency proceedings be granted sparingly and be justified on the record. Most pertinent to this case is subdivision (b) of section 352, which provides: "Notwithstanding any other provision of law, if a minor has been removed from the parents' or guardians' custody, no continuance shall be granted that would result in the dispositional hearing, held pursuant to Section 361, being completed longer than 60 days after the hearing at which the minor was ordered removed or detained, unless the court finds that there are exceptional circumstances requiring such a continuance. . . . *In no event shall the court grant continuances that would cause the hearing pursuant to Section 361 to be completed more than six months after the hearing pursuant to Section 319*." (Italics added.)

*D.E. v. Superior Court* (2003) 111 Cal.App.4th 502, 513 held that when section 352 comes into conflict with Penal Code section 2562, the restriction on continuances governs. In that case, as in the one before us, the minors' father was incarcerated during dependency proceedings. (*Id.* at p. 505.) The authorities at his institution would not allow him to be transported to the hearing, despite a court order to

---

[8] Father claims he was not present at the October 5, 2011 disposition hearing. The minute order from that date indicates Father was present, as well as at the six-month review held on March 21, 2012.

23

transport him. (*Ibid*.)  Several continuances were granted to attempt to have the father present for a joint jurisdictional and dispositional hearing.  As the six-month mark from the date of detention approached, the court continued to grant continuances to try to allow the father to be present.  (*Id.* at p. 508.)  However, the trial court refused to continue the matter beyond the six-month period established by section 352, subdivision (b).  (*Id.* at p. 509.)  The Court of Appeal held this was a correct ruling.  (*Id.* at pp. 511-513.)

In addition, as the Bureau points out, any failure to comply with Penal Code section 2625 is subject to harmless error analysis.  (*In re Jesusa V.*, *supra*, 32 Cal.4th at pp. 624-625.)  Assuming without deciding that an error occurred here, we would not find it prejudicial employing the test of *People v. Watson* (1956) 46 Cal.2d 818, 836.  (*In re Jesusa V., supra*, at p. 625.)  Father was in no position to take custody of David himself, and he acknowledged as much.  His attorney was present at the hearing to assert his position that David should be returned to Mother and to cross-examine Mother and the social worker on Father's behalf.  In addition, Father had written a three-page letter expressing his desire to reunify with David and his intention to turn his life around, which was attached to the social worker's report.  In that sense Father was allowed to "testify" without cross-examination.  Thus, any unfairness resulting from his physical absence was minimized by the procedures employed.

Yet, given Father's current incarceration, uncertain release date (he appeared to be under a four-year sentence), past history of arrests and convictions, and persistent long-term substance abuse issues, there is no reasonable likelihood that an outcome more favorable to him would have resulted from the hearing even if Father had been physically present.  As the social worker noted, even after Father is eventually released from jail he would need to find a lawful job and housing before he could take custody of David, and he would also require drug intervention to address his substance abuse problem.  David needs permanency sooner than Father would be able to provide it, even if he could overcome his several challenges.  And Father's presence would not have changed Mother's testimony, which did not result in the court's returning David to her.  We conceive of nothing Father could have contributed at the hearing that would have

24

changed the outcome. We therefore find any error in proceeding with the hearing was harmless.

### *Failure to provide Father with visitation and reunification services*

Father contends a section 366.26 hearing cannot be set because he was never provided with visitation or other reunification services to strengthen his family bonds with David. The sad fact is that Father has been incarcerated for virtually all of David's life. Since his incarceration, Father has not had visitation with David, except perhaps during one or two court sessions in which both Father and David were present. In November 2012, Father reported to the social worker that he had been sentenced to four years in prison, and in light of presentence credits, he expected to remain incarcerated for approximately 15 more months. At that time David had already been under the court's jurisdiction for approximately 16 months.

Father was declared a presumed father on October 5, 2011. Ordinarily, an incarcerated presumed father is entitled to reunification services, including visitation. (§ 361.5, subds. (a) & (e); *In re Zacharia D.* (1993) 6 Cal.4th 435, 449.) Section 361.5, subdivision (e)(1), provides an exception where the court finds by clear and convincing evidence that visitation would be detrimental to the child. "In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime or illness, the degree of detriment to the child if services are not offered and, for children 10 years of age or older, the child's attitude toward the implementation of family reunification services, the likelihood of the parent's discharge from incarceration, institutionalization, or detention within the reunification time limitations described in subdivision (a), and any other appropriate factors." (*Ibid.*)

At the hearing on January 30, 2013, Father's status was changed from presumed father to "alleged natural father." An alleged parent is not entitled to reunification services (§ 361.5, subd. (a); *In re Zacharia D.*, *supra*, 6 Cal.4th at p. 451), so there was no error in failing to provide Father with such services at the hearing on January 30, 2013. The Bureau recommended that no reunification services be provided for Father,

25

and he was denied visitation while he was incarcerated based on his criminal history, his uncertain release date, and his substance abuse issues. We note, however, that the court did order supervised visits between Father and David after Father is released from custody.

Father now claims he was improperly denied visitation and other (unspecified) reunification services throughout the dependency period. However, even accepting the original designation of Father as a presumed father, the denial of visitation was not erroneous. Earlier in the dependency proceedings Father was denied visitation because of David's premature birth and fragile health. Thus, Father's incarceration, though undoubtedly a factor, was not the only reason for denying visitation. In any case, these earlier denials of visitation cannot be challenged in this writ proceeding because none of the orders prior to January 30, 2013, was appealed. (*In re Meranda P., supra,* 56 Cal.App.4th at pp. 1151-1152.)

With respect to the orders of January 30, 2013, again, the issue was forfeited by Father's counsel's failure to object to the visitation order and to argue in favor of reunification services or visitation at the hearing. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 221-222; *In re Anthony P.*, *supra*, 39 Cal.App.4th at pp. 641-642.)

But even if we were to reach the merits, we would find no error. There was substantial evidence to support the court's finding by clear and convincing evidence that providing reunification services for Father would be detrimental to David. (§ 361.5, subd. (e)(1).) Father had admitted an intractable drug problem extending over a period of 25 years. He had a lengthy criminal record and was incarcerated and would probably remain incarcerated for at least a year after the January 30 hearing, long after the statutory time limit for reunification. David had not developed an emotional bond with Father, and he had already been placed in several foster homes. David was too young to visit with his father by telephone. And to order personal visits, thereby bringing yet another unfamiliar adult into his life, especially in a jail setting, could be more confusing than beneficial to the child. Finally, if reunification services had been ordered, the

26

unavoidable delay in achieving permanency for David could easily be seen as substantially outweighing any benefit that might be derived from providing visitation with Father.  Thus, ordering reunification services could reasonably be seen as detrimental to David.

It is true that visitation may be ordered under section 361.5, subdivision (f), even if reunification services have been denied for an incarcerated parent: "The court may continue to permit the parent to visit the child unless it finds that visitation would be detrimental to the child."  (See *In re J.N.* (2006) 138 Cal.App.4th 450, 457.)  That language has been construed, however, as vesting the court with complete discretion to grant or deny visitation *unless* it finds that visitation would be detrimental to the child, in which case it *must* deny visitation.  (*Id*. at pp. 457-459.)  A finding of detriment is not required to deny visitation, and the court's ruling is reviewed only for abuse of discretion. (*Id*. at p. 459.)

Father relies on *In re Precious J.* (1996) 42 Cal.App.4th 1463 (*Precious J.*), where this court held that an incarcerated mother was entitled to have visitation with her dependent child, and the social services agency's failure to facilitate such visits precluded termination of parental rights. (*Id*. at pp. 1476-1480.)  Father correctly points out that visitation may not be denied based solely on the fact that the parent is incarcerated.  (*In re Jonathan M.* (1997) 53 Cal.App.4th 1234, 1237-1238; *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1402.)  But the issue in *Precious J.* was not whether visitation should have been ordered—it had been—but rather whether the social services agency had complied with the order to provide such reasonable services.  (*Precious J.*, *supra*, at pp. 1477-1478.)

*In re Calvin P.* (2009) 178 Cal.App.4th 958 (*Calvin P.*) is similar.  There, the mother was incarcerated because an older child, who had been removed from her custody and placed with the father, had died in her care, resulting in an involuntary manslaughter conviction. (*Id*. at pp. 960-961.)  The two other children whose welfare was at issue were ages 12 and seven. (*Id*. at p. 960.) Thus, there was a preexisting established mother-child bond. (*Id.* at p. 961 ["the children wanted to see her"].)  At the six-month review hearing

27

on a subsequent petition alleging the mother's criminal conviction (§ 342), the trial court indicated that reasonable reunification services had not been provided to the mother, but thought the issue was moot, since the children had been placed with the father and the mother was scheduled for release from prison the month after the hearing. (*Id.* at pp. 961-962.) The judge ordered family maintenance services for both parents. (*Id*. at p. 962.) The mother and children appealed, arguing the mother had not been provided with reasonable reunification services.

The Court of Appeal disagreed that the issue was moot. (*Calvin P.*, *supra*, 178 Cal.App.4th at p. 962.) Key to its decision was that, as in *Precious J*., reunification services, including visitation while the mother was in prison, had been ordered by the court at an earlier proceeding but had not actually been provided. (*Id.* at pp. 961-964.) It was the agency's failure to comply with the court's order that led to the reversal on appeal of this part of the court's order.

The present case is not analogous to *Calvin P.* There were no preexisting ties to be preserved with the incarcerated parent and there was no nonincarcerated parent with whom the child could safely be placed. Most significantly, there had never been court ordered reunification services that had not been provided by the Bureau. Mother's efforts to reunify with David had been unsuccessful, Father was in no position to step forward to take care of him, and so the court legitimately moved forward with permanency planning without providing visitation for Father.

## DISPOSITION

Both parents' petitions are denied. We also deny petitioners' requests for a stay of the section 366.26 hearing set for May 22, 2013. Our decision is final as to this court immediately. (Rule 8.490(b)(3).)

Richman, J.

We concur:
    Kline, P.J.
    Lambden, J.

28