[No. D047891. Fourth Dist., Div. One. May 5, 2006.]

CHERYL P. et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Real Party in Interest.

## COUNSEL

Timothy A. Chandler, Alternate Public Defender, Brooke A. Frederickson, Deputy Alternate Public Defender, Richard P. Siref and Neil R. Trop for Petitioners.

No appearance for Respondent.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Katharine R. Bird, Deputy County Counsel, for Real Party in Interest.

## OPINION

**McCONNELL, P. J.**—Cheryl P. and Daniel P., Sr. (Daniel, Sr.), the parents of Daniel P., Jr. (Daniel), and Nicholas P., seek extraordinary writ relief (Welf. & Inst. Code, § 366.26, subd. (*l*); Cal. Rules of Court, rule 38.1).[1] They challenge the juvenile court order denying them reunification services and setting a section 366.26 hearing in Nicholas's dependency case because they had failed to reunify with Daniel. (§ 361.5, subd. (b)(10).) Cheryl and Daniel, Sr., contend the denial of services pursuant to section 361.5, subdivision (b)(10), was error because they made reasonable efforts to treat the problems that had led to the removal of Daniel. Cheryl also contends the court erred by conducting Daniel's 18-month review hearing before Nicholas's dispositional hearing. Cheryl's prayer for relief pertains to both children.

We issued an order to show cause, the San Diego County Health and Human Services Agency (Agency) responded, and the parties waived oral argument. We grant Daniel, Sr.'s petition, and Cheryl's petition insofar as it concerns Nicholas. We direct the juvenile court to order six months of services to Cheryl and Daniel, Sr., in Nicholas's dependency case. We deny Cheryl's petition insofar as it concerns Daniel.

---

[1] All statutory references are to the Welfare and Institutions Code; all rule references are to the California Rules of Court.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2004, a San Diego police officer found two-year-old Daniel asleep on a sidewalk next to Cheryl and Daniel, Sr. The officer took Daniel into protective custody when he was unable to awaken the parents; the officer believed Daniel could have been kidnapped while the parents were sleeping. The family had been in San Diego about six days after moving from Tennessee. Both Daniel, Sr., and Cheryl received disability compensation for their mental conditions.

Agency filed a dependency petition under section 300, subdivision (b), alleging Daniel was at risk because he had been inadequately supervised. In late May, Daniel was detained in a licensed foster home. Daniel was brought current on all vaccinations and received medical and dental examinations. The dentist found 12 decayed teeth; three needed to be extracted and four had nerve damage that required root canals and subsequent crowns. Cheryl and Daniel, Sr., were unconcerned because Daniel had only baby teeth and they believed he was too young to go to a dentist.

In August, the juvenile court sustained the petition, declared Daniel a dependent child and ordered Cheryl and Daniel, Sr., to comply with their case plans.

By that time, Cheryl and Daniel, Sr., were renting a studio apartment, which the social worker reported was adequate for the family. Cheryl underwent a psychological evaluation by Kristina Franey, who reported that although Cheryl "has cognitive limitations, with the proper support system in place it would appear that [Cheryl] would be able to protect Daniel. She does not pose a risk to him. . . . However, she does not appear to comprehend why Daniel was removed from their custody other than the fact that they were homeless. She sees herself as a victim of circumstance.[2] She will need help understanding how Daniel has been neglected, such as his dental work and lack of immunizations, to help prevent future episodes of neglect." Franey noted that Cheryl was bonded with Daniel and was able to provide for his basic needs. Franey referred Cheryl to the San Diego Regional Center (Regional Center).

Daniel, Sr., who had displayed an inability to control his anger from the beginning of the case,[3] was evaluated by psychologist Thomas Barnes.

---

[2] Cheryl told Franey that she felt betrayed by the system, explaining it was her understanding "she was only supposed to get housing and they would get Daniel back, but now Children's Services has changed their minds."

[3] Daniel, Sr., frequently behaved in a threatening and seemingly uncontrollable manner toward social workers, Daniel's foster mother and visitation monitors. After his son was removed, Daniel, Sr., became upset and broke his arm by punching the wall. Daniel, Sr., also

Barnes reported Daniel, Sr., was evasive and unwilling to disclose much information. Daniel, Sr., tested in the average range of intellectual ability. Barnes noted that Daniel, Sr., had difficulty in dealing effectively with stress and was defensive. "It appears that [Daniel, Sr.,] cannot address conflicts in a developmentally appropriate fashion[; r]ather, he simply pretends that they do not exist and might vanish as if by magical thinking," wrote Barnes. Daniel, Sr., also failed to recognize the dangers of his lifestyle and the possible effects it would have on Daniel. Barnes recommended a psychiatric evaluation, psychotherapy and a comprehensive parenting class.

In January 2005, the social worker asked the court to suspend visitation after Daniel, Sr., threatened to take Daniel from the foster home because he believed his son was being abused when he saw a scrape on the boy's chin. The social worker also reported that the parents attempted to remove Daniel from the visitation center. Daniel, Sr., denied this, stating that the boy had run off and was almost hit by a car before Cheryl grabbed him and returned him to the center. According to a visitation monitor, Daniel, Sr., said that when he received unsupervised visits, he would not return Daniel to the foster home if the boy did not want to go back there. The social worker stated: "Both parents appear to be devoted to their son and react defensively to protect him. It is this reaction in [Daniel, Sr.,] that one perceives as threatening and dangerous. [Daniel, Sr.,] tends to react without forethought and becom[es] easily agitated, aggressive and defiant. He has made threatening statements to this worker and those caring or providing a service to his son. . . . [¶] . . . Furthermore, when [Daniel, Sr.,] gets upset, it triggers [Cheryl, who] also becomes agitated. Furthermore, when [Daniel, Sr., and Cheryl] are agitated, they appear to be a flight risk during visitation if given the opportunity. [¶] [Daniel, Sr., and Cheryl] appear to suffer from cognitive deficits and will need on-going assistance to adequately parent Daniel. Their lack of sophistication and cognitive deficiencies create a risk to the minor and a heightened level of anxiety to everyone involved in the case. . . . The Agency recommends that [Daniel, Sr.'s and Cheryl's] visit[s] be suspended until they have further engaged in reunification services to increase their parenting skills and level of cognitive functioning which would reduce the risk for abuse and promote reunification."

On January 7, the juvenile court suspended visits between Daniel, Sr., and Daniel, but ordered visitation between Cheryl and Daniel remain supervised

---

was uncooperative and obstinate; he initially refused to provide background information to social workers and rejected their suggestion he live in a shelter while he and Cheryl were homeless.

at the social worker's office. The court also granted the social worker discretion to resume Daniel, Sr.'s visitation, with input from his therapist.[4]

Daniel, Sr., had begun individual therapy with psychologist Daniel O'Roarty on January 5. O'Roarty reported he was concerned with Daniel, Sr.'s anger issues and thought he might be depressed. O'Roarty referred Daniel, Sr., to a psychiatrist for a medication assessment. On February 8, Daniel, Sr., went to the psychiatrist's office for the evaluation, but left when he was told he would have to wait for over one hour. Agency recommended Daniel, Sr.'s visits continue to be suspended.

At the six-month review hearing on March 2, the court continued the suspension of Daniel, Sr.'s visitation, but gave the social worker discretion to resume visits once he completed his psychiatric evaluation and the therapist approved. The court also ordered six more months of services.[5]

By this time, Cheryl was pregnant.

On March 16, Daniel, Sr., underwent a psychiatric evaluation by Dr. Stephanie Buchert, who diagnosed him as having a mood disorder and impulse control disorder. Buchert opined Daniel, Sr., would benefit from medication. The psychiatrist observed: "[Daniel, Sr.'s] difficulties with receptive language processing cause him to misunderstand what people communicate to him and leads to frustration and anger. This, coupled with his size and intimidating appearance, leads to problems in interpersonal relationships." Buchert also noted that although Daniel, Sr., initially is resistant to recommendations, he becomes more receptive once he better understands the reasons and benefits of the recommendations.

On May 10, the court ordered reinstatement of Daniel, Sr.'s supervised visitation over the objection of Agency and Daniel's counsel. The court noted that Daniel, Sr., had "complied with what the court [had] asked of him."

Later that month, psychologist O'Roarty reported that Daniel, Sr., "tends to rigidly get focused on one particular thing and miss the bigger picture, until it is slowed down and explained to him. He quickly categorizes those people who are for or against him, seeing his social worker as being against[;] therefore he refuses to directly acknowledge her. Unfortunately, this naiveté and stubbornness on his part has resulted in personality issues overriding his

---

[4] Daniel, Sr., appealed. We affirmed the juvenile court's findings and orders regarding the suspension of Daniel, Sr.'s visitation. (*In re Daniel P., Jr.* (June 20, 2005, D045679) [nonpub. opn.].)

[5] Daniel, Sr., unsuccessfully appealed the order continuing the suspension of his visitation. (*In re Daniel P., Jr.* (Nov. 10, 2005, D046336) [nonpub. opn.].)

focus to get his son back. He cannot nuance and is not sophisticated enough to hide his chagrin enough to attain his ultimate goal to visit and be with his son. A garrison mentality pervades that comes from a severely abusive childhood. [¶] Despite [Daniel, Sr.'s] 'grump & growl' he is a very vocal champion of children not having to face the harsh institutional care that he was subjected to. He has a sense of humor and a loyalty to those he cares for and who (he feels) do him no harm. He has anger that he freely acknowledges and daily works on to mitigate. He has anxiety and depression, which he has been trying to address through a fast track in getting medication. He has frustration with 'The System' which he is attempting, in therapy, to put some perspective on[,] i.e.[,] greater empathy and identification with the court and the social worker's concerns. [¶] I would recommend increased visitation with his son that weekly increases to the point of having his son home with him and his wife, before the delivery of their next son in August. He has worked hard to prove himself and I ask that his obtrusiveness in social discourse, especially with those in authority, not harm his efforts to soon reunite with his son."

However, during the following summer, Cheryl and Daniel, Sr., resisted Agency's attempts to persuade Cheryl to enroll in the Regional Center's adaptive functioning services program and to have both parents participate in an in-home comprehensive parent education class. Because of her pregnancy, Cheryl's doctor ordered her to be on complete bed rest. Nonetheless, she still visited Daniel and accompanied Daniel, Sr., to his therapy appointments. In July, the court encouraged Cheryl and Daniel, Sr., to comply with their case plans.

At the 12-month review hearing on August 3, the court found Cheryl and Daniel, Sr., had made good progress with their case plans and substantial progress in alleviating the causes that led to Daniel's dependency. The court ordered six more months of services.

In early October, Cheryl gave birth to Nicholas. Agency filed a dependency petition on his behalf, alleging he was at risk because of his parents' cognitive and mental health problems. (§ 300, subd. (b).)

At the contested jurisdictional hearing on October 24, Nicholas's social worker testified the infant was at high risk because Cheryl and Daniel, Sr., had failed to reunify with Daniel after almost 18 months of services, and, as a newborn, Nicholas was completely helpless. The social worker also cited the parents' inadequate parenting skills. The court sustained Nicholas's petition, noting the parents' cognitive limitations and mental health problems impeded their ability to care for the child without Agency involvement. The court set the disposition hearing for the same day as Daniel's 18-month review hearing.

Agency recommended services be terminated in Daniel's case and not be provided in Nicholas's case.

On January 11, 2006, the court, over the objection of Cheryl's counsel, conducted the 18-month review hearing in Daniel's case before the dispositional hearing in Nicholas's case. Two social workers testified that Daniel, Sr., had made only minimal progress addressing his anger. Psychologist O'Roarty testified that although Daniel, Sr., was loud and belligerent, he was "somewhat of a pussy cat." O'Roarty opined that Daniel, Sr., was better able to handle his anger and his medication helped him deal with stress. However, O'Roarty said Daniel, Sr., did not accept his role in Daniel's removal.

The court terminated services in Daniel's case after noting that Cheryl and Daniel, Sr., tried hard and wanted to be good parents. However, the court said Daniel, Sr.'s first reaction always was to refuse to cooperate with Agency and service providers before eventually complying. Sometimes the parents made progress, sometimes they did not. Daniel, Sr.'s temper got in the way of his progress. The court said it could not find six more months would make a difference. The court found Agency had provided reasonable services and it would be unsafe to return Daniel to his parents' custody.

The court then addressed Nicholas's disposition. The court found section 361.5, subdivision (b)(10) applied and denied services to Cheryl and Daniel, Sr. The court observed the rationale behind the statute was if the reunification process had been unsuccessful, Agency should not have to continue to provide services. The court said it knew of no services that could be provided to Cheryl and Daniel, Sr., which had not already been provided to them in Daniel's case. The court found it was not in Nicholas's best interests to offer the services. "I don't see what we can provide that will make any difference in the next six months," the court remarked.

## DISCUSSION

Cheryl and Daniel, Sr., contend the juvenile court erred by denying them services in Nicholas's dependency case under section 361.5, subdivision (b)(10). We agree.

There is a presumption in dependency cases that parents will receive reunification services. (*Riverside County Dept. of Public Social Services v. Superior Court* (1999) 71 Cal.App.4th 483, 487 [83 Cal.Rptr.2d 777].) Section 361.5, subdivision (a) directs the juvenile court to order services *whenever* a child is removed from the custody of his or her parent *unless* the case is within the enumerated exceptions in section 361.5 subdivision (b). (*Rosa S. v. Superior Court* (2002) 100 Cal.App.4th 1181, 1188 [122 Cal.Rptr.2d 866].)

Section 361.5, subdivision (b) is a legislative acknowledgement "that it may be fruitless to provide reunification services under certain circumstances." (*Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750 [50 Cal.Rptr.2d 858].)

Section 361.5, subdivision (b) reads in pertinent part: "(b) Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (10) That the court ordered termination of reunification services for any siblings . . . of the child because the parent . . . failed to reunify with the sibling . . . after the sibling . . . had been removed from that parent . . . pursuant to Section 361 and that parent . . . is the same parent . . . described in subdivision (a) and that, according to the findings of the court, this parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling . . . of that child from that parent . . . ."

Thus, section 361.5, subdivision (b)(10) has two prongs or requirements: (1) the parent previously failed to reunify with a sibling of the child; *and* (2) the parent failed to make reasonable efforts to correct the problem that led to the sibling being removed from the parent's custody.

In enacting section 361.5, subdivision (b)(10), "the Legislature has made the decision that in some cases, the likelihood of reunification is so slim that scarce resources should not be expended on such cases." (*Riverside County Dept. of Public Social Services v. Superior Court, supra,* 71 Cal.App.4th at p. 488.) "Inherent in this subdivision appears to be a very real concern for the risk of recidivism by the parent despite reunification efforts." (*Deborah S. v. Superior Court, supra,* 43 Cal.App.4th at p. 751.)

A court reviews an order denying reunification services under section 361.5, subdivision (b) for substantial evidence. (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 600 [110 Cal.Rptr.2d 679].)[6]

The juvenile court took jurisdiction over Nicholas, then three weeks old, under section 300, subdivision (b), finding he was at substantial risk of harm because his father suffered from mental illness and his mother had marginal intellectual functioning. Neither parent challenges the jurisdictional finding under section 300, subdivision (b).

---

[6] Agency incorrectly asserts that the proper standard of review is abuse of discretion. The assertion would be correct under section 361.5, subdivision (c), which gives the court discretion to order services after finding section 361.5, subdivision (b)(10) is applicable. But section 361.5, subdivision (c) did not become operative because, as will be shown *post,* the court erroneously applied section 361.5, subdivision (b)(10).

Also, neither parent argues that the first prong of section 361.5, subdivision (b)(10) was not met—namely, that Cheryl and Daniel, Sr., had previously failed to reunify with Nicholas's sibling, Daniel. However, Cheryl and Daniel, Sr., contend that the second prong of section 361.5, subdivision (b)(10)—parental failure to make a reasonable effort to treat the problems giving rise to Daniel's dependency proceeding—was not met. The "no reasonable effort" clause provides a means of mitigating a harsh rule that would allow the court to deny services based only upon the parent's prior failure to reunify with the child's sibling "when the parent had in fact, in the meantime, worked toward correcting the underlying problems." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 842 [23 Cal.Rptr.3d 207].)

In *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464 [118 Cal.Rptr.2d 118], the Court of Appeal observed the " 'reasonable effort to treat' standard [under section 361.5, subdivision (b)(10),] is not synonymous with 'cure.' The mere fact that [mother] had not entirely abolished her drug problem would not preclude the court from determining that she had made reasonable efforts to treat it."

Here, the juvenile court did not make a finding that the parents failed to make a reasonable effort to treat the problems leading to Daniel's removal from their custody. Rather, the court based the denial of services in Nicholas's case principally on Cheryl's and Daniel, Sr.'s failure to reunify with Daniel, and its view that more services would not make any difference. By focusing on Cheryl's and Daniel, Sr.'s lack of sufficient progress after receiving 18 months of services specially tailored for them, the court seemingly ignored the second prong of section 361.5, subdivision (b)(10)—whether the parents had failed to make a reasonable effort to treat their problems. In fact, the court praised Cheryl and Daniel, Sr., for trying hard and wanting to be good parents.

The juvenile court applied the wrong standard—namely, that six more months of services would be pointless because Cheryl and Daniel, Sr., had not eliminated their problems after 18 months of services. The court essentially adopted a "fruitless" standard. Although cases, such as *Deborah S. v. Superior Court, supra,* 43 Cal.App.4th at page 750, have characterized section 361.5, subdivision (b) as a legislative acknowledgement "that it may be fruitless to provide reunification services under certain circumstances," section 361.5, subdivision (b)(10) specifically requires a finding the parent did not make "a reasonable effort to treat the problems that led to removal of the sibling." Section 361.5, subdivision (b)(10) does *not* impose a "fruitless" standard, which would be a "pretty high standard." (*Renee J. v. Superior Court, supra,* 96 Cal.App.4th at p. 1464.) The *Renee J.* court continued: "If the evidence suggests that despite a parent's substantial history of misconduct

with prior children, there is a reasonable basis to conclude that the relationship with the current child could be saved, the courts should always attempt to do so. Courts must keep in mind that '[f]amily preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced.' [Citation.] The failure of a parent to reunify with a prior child should never cause the court to reflexively deny that parent a meaningful chance to do so in a later case. To the contrary, the primary focus of the trial court must be to *save* troubled families, not merely to expedite the creation of what it might view as better ones." (*Ibid.*)

Even if we were to assume the juvenile court implicitly found that Cheryl and Daniel, Sr., had not made a reasonable effort to treat the problems that led to the removal of Daniel, we conclude a trier of fact could not reasonably make such a finding by clear and convincing evidence. Daniel was removed from his parents' custody because they were homeless and did not properly supervise him. By the time of the dispositional hearing, Cheryl and Daniel, Sr., were renting an apartment, which was deemed adequate for the family. However, at that point, it became clear that Cheryl and Daniel, Sr., had neglected Daniel, as evidenced by his decaying teeth, and the parents' cognitive limitations and mental illness presented risks to the child. Although recalcitrant at times about services, the parents complied with their case plans and demonstrated progress. They underwent psychological and psychiatric evaluations, completed parenting courses, engaged in individual therapy and regularly visited their son. Daniel, Sr., followed his medication regimen and also attended an anger management course. All the professionals agreed Cheryl and Daniel, Sr., loved their son and were devoted to him. In sum, we conclude Agency did not meet its burden to prove, by clear and convincing evidence, that Cheryl and Daniel, Sr., had not made a reasonable effort to treat the problems that led to Daniel's removal.

▮ Our conclusion unavoidably rests on the premise that when a case involves the almost simultaneous termination of services in the sibling's case and the denial of services at the child's dispositional hearing, the statutory language "has not *subsequently* made a reasonable effort to treat the problems" (§ 361.5, subd. (b)(10), italics added) refers to reasonable efforts made since the removal of the sibling. (But see *In re Harmony B., supra*, 125 Cal.App.4th at pp. 842–843.) Otherwise, the word "subsequently" would require an extremely truncated period—in some cases, a matter of minutes—for the parent to demonstrate a "reasonable effort" to treat the problems that led to the sibling's removal. In *In re Harmony B.*, the Court of Appeal observed: "When . . . the two proceedings occur in immediate proximity, the trial court required finding under the 'no-reasonable effort' clause is a formality because the parent's circumstances necessarily will not have changed." (*Ibid.*) In our view, the *In re Harmony B.*, court's interpretation of

section 361.5, subdivision (b)(10) necessarily adopts the position that the Legislature intended to provide disparate treatment between cases in which some time has elapsed after services have been terminated in the sibling's dependency and cases in which termination of services in the first case is closely followed by the child's dispositional hearing. Under the *In re Harmony B.,* court's interpretation, failure to reunify in the former situation would not preclude services, but services would be precluded in the latter situation. We cannot accept that was the Legislature's intent. ▉ "[I]t is settled that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the Legislature did not intend. To this extent, therefore, intent prevails over the letter of the law and the letter will be read in accordance with the spirit of the enactment." (*In re Michele D.* (2002) 29 Cal.4th 600, 606 [128 Cal.Rptr.2d 92, 59 P.3d 164].)

The juvenile court's approach in Nicholas's case of focusing on Cheryl's and Daniel, Sr.'s progress rather than the extent of their efforts may have been proper if Agency had sought a denial of services under section 361.5, subdivision (b)(2), which allows the court to deny services when a parent's mental disability "renders him or her incapable of utilizing those services." (§ 361.5, subd. (b)(2).) However, Agency sought to deny services in Nicholas's case pursuant to section 361.5, subdivision (b)(10).

Agency argues unpersuasively that although the language of section 361.5, subdivision (b)(10), does not mention the requirement of making progress, such a requirement can be inferred. In its response to the parents' petitions, Agency states the statutory language requirement of *"reasonable efforts . . .* implies the efforts need to be likely to actually ameliorate the problems, which further implies the court should be able to see progress." We disagree. In our view, it is more likely the Legislature used the adjective "reasonable" to ensure that lackadaisical or half-hearted efforts would not be deemed adequate rather than to additionally require a certain level of progress. If the Legislature intended to require a showing of progress in section 361.5, subdivision (b)(10), it could have inserted explicit language to do so. The expression of certain things in a statute necessarily involves the exclusion of other things not expressed. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391, fn. 13 [241 Cal.Rptr. 67, 743 P.2d 1323].) This court cannot add language to a statute that " '. . . the Legislature must be deemed to have omitted intentionally.' " (*Santa Fe Transp. Co. v. State Board of Equalization* (1959) 51 Cal.2d 531, 539 [334 P.2d 907].)

## DISPOSITION

Let a writ issue directing respondent juvenile court to (1) vacate its order denying reunification services to Cheryl and Daniel, Sr., for Nicholas and

setting the matter for a section 366.26 permanency planning hearing in his dependency case and (2) issue a new order directing Agency to provide six months of services to Cheryl and Daniel, Sr., in Nicholas's case. Insofar as Cheryl's petition concerns Daniel, it is denied.[7]

This opinion is final immediately as to this court. (Rule 24(b)(3).)

Aaron, J, and Irion, J., concurred.

---

[7] In light of our disposition as to Nicholas, it is unnecessary to address Cheryl's contention that the court erroneously conducted Daniel's 18-month review hearing before Nicholas's dispositional hearing.