Filed 12/8/14  In re A.A. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.A., a Person Coming Under Juvenile Court Law. | B259187 |
| | (Los Angeles County Super. Ct. No. CK72166) |
| THERESA A., | |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING.  Petition for extraordinary writ.  (Cal. Rules of Court, rule 8.452.)  Steff Padilla, Judge.  Petition denied.

Law Offices of Timothy Martella, Brian Bitker and Frank Ahn, for Petitioner.

No appearance for Respondent.

Children's Law Center of Los Angeles (CLCLA1), Ronnie Cheung and Anna Bokides for Minor.

_____

Theresa A. (mother) has filed a petition for extraordinary writ (Cal. Rules of Court, rule 8.452) challenging the juvenile court's order declining to offer her family reunification services, and setting a hearing to consider the termination of mother's parental rights to her daughter, A. (Welf. & Inst. Code, § 366.26.)[1] We find substantial evidence supports the juvenile court's order. (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.) Accordingly, we deny the petition.

## FACTS AND PROCEDURAL HISTORY

By her own description, mother has "a substantial history with the juvenile court." Mother herself became a dependent child of the court when she was detained from her own mother at birth, having been exposed to cocaine in utero. Mother received family preservation services as a child due to her mother's alcohol abuse and because there was domestic violence in her mother's home. As mother grew older, she had behavior problems and became violent with her own mother. Mother has also had significant involvement with the criminal justice system, both as a juvenile and as an adult.

Mother's son J.C. was born in 2008. Mother and J.C.'s father engaged in domestic violence in J.C.'s presence, and were alleged to have physically and emotionally abused J.C. Mother received family reunification services, which were terminated because mother failed to comply with the court-ordered case plan. J.C. was legally adopted in July 2010.

A. was born in October 2010. A. first came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in February 2011. DCFS received a call reporting that mother was incarcerated and had left A. in the care of her own mother (maternal grandmother), who was prostituting A.'s maternal aunt, a minor who abused drugs and alcohol. DCFS determined that the allegations were inconclusive, and the referral was closed.

In April 2011, DCFS received a call reporting that mother was incarcerated and again had left A. in the care of the maternal grandmother, who in turn left A. in the care

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

of her 12-year-old, developmentally delayed son (A.'s maternal uncle). The caller also reported that the maternal aunt, who lived in the home, sold marijuana and kept a gun in her closet.

In June 2011, the juvenile court sustained a section 300 petition based on mother's incarceration, her failure to make an appropriate plan of ongoing care and supervision for A., her six-year history of substance abuse, her history of domestic violence with J.C.'s father, and the termination of her parental rights to J.C. Mother completed her required court activities and A. was returned to her care in December 2012.

In December 2013 and January 2014, DCFS received two anonymous phone calls involving mother's behavior toward A. On December 13, 2013, a caller reported that the previous day, mother hit A. in the face with her fist. The caller also reported that mother "leaves the child in the home alone to care for herself" and "leaves the child alone in the car or on the porch unsupervised." While DCFS was investigating the December referral, it received a call on January 3, 2014, reporting that mother had thrown A. to the floor three times because A. spilled a box of cereal on the floor, and had hit A. 15 to 20 times on the buttocks and hands with a "flip-flop" rubber sandal. Mother placed A. on a time out. When A. went into the bathroom, mother dragged her out by the hair, slammed her on the ground, put her face on a chair and hit her again 15 to 20 times with the sandal. The caller further reported that A. twisted and turned when mother hit her, and mother grabbed A. and threw her on the bed. The caller stated that he or she wanted to take A. from the home and call law enforcement, but was afraid of mother retaliating. The caller also reported that two weeks prior to this incident, the caller witnessed mother hitting the mother's boyfriend. The investigating social worker could not confirm either of these incidents because the caller was anonymous and DCFS lost contact with mother and A. The referrals were then closed.

This dependency proceeding was instigated on March 7, 2014, when DCFS received a referral regarding a domestic violence incident between mother and her ex-boyfriend D.L., with whom she lived. Mr. L. contacted police, who arrested mother. Mr. L. told police that he was lying in bed trying to go to sleep when mother shouted at

3

him and threw cigarette ashes on him. Mother followed Mr. L. to the bathroom, continued to shout at him, and dug her nails into his arm, inflicting deep scratches. Mother left A. in Mr. L.'s care when she was taken to jail.

DCFS social workers interviewed Mr. L. at the home following mother's arrest. Mr. L. told the social workers that mother had been acting violent with him for several months, and had engaged in loud incidents in A.'s presence.[2] The social workers asked Mr. L. if they could inspect the family's apartment. Mr. L. seemed reluctant, stating that mother would often start things and not finish them. The social workers found the apartment to be cluttered and dirty. The social workers decided to detain A. when Mr. L. said that he planned to bail mother out of jail and bring her home.

On March 12, 2014, the juvenile court found DCFS had made a prima facie case for detaining A. Mother did not appear at the detention hearing.[3]

DCFS social worker Jonathan Willey interviewed mother on April 29, 2014, and the results of the interview were included in his report prepared for the jurisdiction/disposition hearing set for May 8, 2014. Mother said the allegations concerning the domestic violence incident with Mr. L. were not true, and that the incident involved "stupid stuff" and was "blown out of proportion." Mother said she was homeless, disabled, and receiving financial assistance, and suffered from anxiety, bipolar disorder, depression, posttraumatic disorder and difficulty with concentration. When asked if she was receiving treatment, mother stated that "mental health has no record of her and will not help her." When asked about counseling services, mother said it was "hard for her to do that," that things were "messed up," and it was all a "mental strain."

---

[2]    In a later interview, Mr. L. stated that he had prior violent incidents with mother, but this was the first time he contacted law enforcement.

[3]    DCFS social worker James Ippolito interviewed mother at the Los Angeles County Sheriff's facility in Lancaster. Mr. Ippolito reported that mother "appeared to be disengaged and stated that she did not care about anything," including Mr. L., her daughter A., or Mr. Ippolito himself. Mr. Ippolito encouraged mother to attend the detention hearing. Mother replied that she did not know if she would go, and that Mr. L. should go as the incident was entirely his fault.

The jurisdiction/disposition report also set forth mother's lengthy criminal history, consisting of 19 entries beginning with 2008 (a domestic violence incident involving mother and J.C.'s father) and ending with the 2014 domestic violence incident with Mr. L. Mother's criminal record included arrests for battery, assault, prostitution, and drug offenses. In 2007, mother was sentenced to state prison for possession of a controlled substance, after violating the terms of her probation. In 2009, mother was sentenced to state prison in two separate cases, one for assault and another for corporal injury to a spouse. Mother's criminal record included numerous probation violations.

Following the initial jurisdictional hearing on May 8, 2014, the juvenile court ordered DCFS to provide mother with referrals for domestic violence counseling, parenting, individual counseling and anger management. Mother's counsel asserted that mother had had monitored visitation with A. during the prior week and wanted to continue the visitation. The court ordered DCFS to provide mother with a bus pass to facilitate visitation. The court continued the jurisdictional hearing to July 16, 2014, and ordered DCFS to file a supplemental report addressing various issues by July 9, 2014. The report was to include an interview with mother.

In a "Last Minute Information for the Court" dated July 8, 2014, the DCFS social worker reported that she had been unable to reach mother. The social worker reported she had called mother's cell phone number but mother's "voicemail comes up and . . . cannot take any messages." It turned out that mother had been arrested on June 13, 2014, and was incarcerated at the Century Regional Detention Center.

At the continued jurisdictional hearing on July 16, 2014, mother signed a waiver of rights form and pled no contest to the petition. The juvenile court sustained the petition as amended. A.'s counsel indicated she would be asking the court to deny mother reunification services. Mother's counsel argued that mother was entitled to a noticed motion on an issue of such significance. The court continued the disposition hearing to August 21, 2014.

On August 7, 2014, A.'s counsel moved for an order denying mother reunification services pursuant to section 361.5, subdivision (b)(11), based on the court's having

terminated mother's parental rights to A.'s half-sibling J.C.[4]  In response to the motion, mother argued that she had "worked towards correcting her underlying problems and yet *at age 26*, she fell prey to making the same mistake with another man.  Mother is further committed to continue addressing these issues once she gets an opportunity to after her recent incarceration ends."

The contested disposition hearing was twice continued because mother was still in the custody of the sheriff and had not been brought to court.  The disposition hearing convened on September 5, 2014.  The juvenile court received into evidence five reports prepared by DCFS:  the detention report with attachments, dated March 12, 2014; the jurisdiction/disposition report with attachments, dated May 8, 2014; the "Last Minute Information" report with attachments, dated July 16, 2014; the prerelease investigation, dated July 24, 2014; and a supplemental report dated August 21, 2014.  No other evidence was offered other than that contained in the reports.  Although mother's counsel stated that mother wanted to testify in her own behalf, and the court continued the hearing to allow sufficient time for mother's testimony, when the hearing reconvened mother was too upset to enter the courtroom and testify.  With the consent of mother's counsel, the hearing proceeded in mother's absence.

A.'s counsel argued that mother should not be given reunification services, because her parental rights to J.C. had been terminated and she had not made reasonable efforts to address the problems that led to the removal of her son.  Moreover, this was the second time A. had been under the court's jurisdiction; A. had spent half her life as a dependent child of the court even though she was only three years old.  Both this proceeding and the one involving J.C. were instigated by incidences of domestic

---

**4**     That section provides:  "(b) Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following:  [¶] . . . [¶]  (11) That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent."

violence. And, even though the case had been continued several times due to mother's incarceration, mother had not demonstrated any substantive progress in any programs or even regularly visited her child.

Mother's counsel acknowledged that mother "clearly has issues based on her history and her behavior today." However, under section 361.5, subdivision (b)(11), the juvenile court could not deny mother reunification services based on the termination of her parental rights to J.C. if mother had made a reasonable effort to treat the problems that led to the removal of J.C. Counsel argued that although mother had spent a substantial time in custody, she had "made some effort when she's not in custody." Counsel cited the fact that mother had gone to parenting class on her own.[5] Although mother "clearly has anger issues, . . . domestic violence issues," and "she's working towards those issues through whatever means would be readily available to her, but she needs help. She needs F.R. [family reunification]. She wants F.R."

The juvenile court declined to offer mother reunification services, and set the matter for a January 12, 2015, hearing to consider the termination of mother's parental rights.

## DISCUSSION

"Ordinarily, when a child is removed from parental custody, the juvenile court must order services to facilitate the reunification of the child. (§ 361.5, subd. (a).)" (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914.) "'Nevertheless, as evidenced by section 361.5, subdivision (b), the Legislature recognizes that it may be fruitless to provide reunification services under certain circumstances. [Citation.] Once it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources.'" (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744, citing *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.)

---

**5** Mother attended a total of three parenting classes: June 3, 2014; June 10, 2014; and September 9, 2014.

Mother cites case law to the effect that she need not have entirely resolved the problems that led to J.C.'s removal in order for a court to find that she had made a "reasonable effort" to treat those problems. (See, e.g., *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450; *Cheryl P. v. Superior Court, supra,* 139 Cal.App.4th at p. 96.) However, in determining whether a parent has made a "reasonable effort," a juvenile court may consider a number of factors such as the duration, extent and context of the parent's efforts, other factors relating to the quality and quantity of those efforts, and the parent's progress, or lack thereof. (*R.T. v. Superior Court, supra,* 202 Cal.App.4th at p. 914.)

Mother contends that the record here is "silent as to the reasonableness of [her] efforts to address the issues that led to [J.C.'s] removal." A more accurate description would be that the record is *devoid* of evidence that mother made any effort, let alone a "reasonable effort," to address the anger and domestic violence issues that led the juvenile court to remove both her children. Mother was in and out of jail during the six-month duration of this proceeding, and, other than having attended three parenting classes during that six months, there is no evidence that mother participated in any other services in any meaningful way. By any standard, that is not a "reasonable effort" to address the issues that led to the removal of her children.

The evidence before the court consisted of DCFS reports documenting mother's lengthy involvement with the juvenile and criminal courts, her mental and emotional instability (including her history of domestic violence), and her failure to comply even minimally with the case plan here. These reports constitute substantial evidence supporting the juvenile court's conclusion that mother had not made reasonable efforts to treat the problems that led to the removal of J.C. from her care. (*Cheryl P. v. Superior Court, supra,* 139 Cal.App.4th at p. 96.)

Also relevant to this proceeding is language in section 361.5, subdivision (c), which provides that "[t]he court shall not order reunification for a parent described in paragraph . . . (11) . . . of subdivision (b ) unless the court finds, by clear and convincing

8

evidence, that reunification is in the best interest of the child." By no stretch of the imagination could the juvenile court make such a finding here.

As the juvenile court noted, "the function of the dependency court is to attempt to reunify parents when it's safe for the children," but the system is "child focused and not parent focused." A., who is now four years old, has twice been a dependent child of the court. The juvenile court found that at the present time mother is incapable of adequately parenting A. We agree, based on evidence in the record of mother's emotional instability, criminal history, and sporadic visitation with A. We also agree with the court's assessment that the situation would not likely change even if mother were to receive the six months of reunification services the court would have offered had mother shown any progress toward resolving her issues. Nor would A.'s best interests be served were mother to receive reunification services.[6]

## DISPOSITION

The petition for extraordinary writ is denied. This opinion shall become final immediately upon filing. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.</u>

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.      _____, J.
BOREN                 HOFFSTADT

---

[6]    A. has lived with the M. family both times she was removed from mother's care, and has bonded with them. At the hearing below, mother's counsel told the court that mother "loves the fact that [A.] is with the [M.] family," and in fact "[t]he mother is actually the godmother of [A.] now, and they have a close relationship." Mr. and Mrs. M. wish to adopt A. and DCFS has assessed their home for A.'s permanent placement.

9