Filed 1/8/16  In re Aurora Z. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re AURORA Z., a Person Coming Under the Juvenile Court Law. | D068914 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519179A) |
| v. | |
| WILLIAM Z., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Sharon L. Kalemkiarian, Judge.  Affirmed.

Michele Anne Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Jennifer M. Stone, Deputy County Counsel, for Plaintiff and Respondent.

William Z. appeals the juvenile court's order denying reunification services to him with respect to his minor child, Aurora Z., under Welfare and Institutions Code[1] section 361.5, subdivision (b)(10) and (11). William contends there was no substantial evidence to support the court's finding that he did not make reasonable efforts to resolve the problems leading to the removal from his custody of his four children from another relationship (collectively, the older children). We disagree and affirm the juvenile court's order.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Aurora was born in January 2015 to William and Christine J. The San Diego County Health and Human Services Agency (Agency) opened her dependency case in April 2015, after its child abuse hotline received a referral alleging general neglect and emotional abuse by Christine and sexual abuse by her fiancé, Shawn B., a registered sex offender, and police officers and a social worker found Christine and Aurora staying in a hotel room with Shawn. Christine told a social worker she permitted Shawn to care for Aurora when Christine was recovering from seizures. The Agency filed a petition on

---

1      All further statutory references are to the Welfare and Institutions Code.
William's notice of appeal also states "the court made a true finding on the petition and placed . . . minor in out[-]of[-]home care," but he asserts no claim of error as to these rulings. Accordingly, we deem that portion of his appeal abandoned. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.) Aurora filed a letter brief with this court indicating she joins in the Agency's arguments. Aurora's mother, Christine, does not appeal.

2      We limit the facts to those relevant to William's appeal. As a result, we generally omit discussion of violent acts by Christine against William, unless necessary to provide context.

2

Aurora's behalf under section 300, subdivision (d), based on Shawn's residence with and/or care for her.

The detention report summarized the prior dependency proceedings for William's older children. The Agency had filed a petition in October 2011 based on allegations the children were exposed to violent confrontations between their parents, and the children became dependents in February 2012. Reunification services for the oldest child were terminated in March 2014 and for the others in July 2014.[3] Parental rights for all four children were terminated in March 2015. William's case plan had consisted of, among other things, domestic violence prevention and substance abuse services. He completed a 52-week domestic violence program and substance abuse treatment (focusing on alcohol, according to William). The domestic violence program instructor noted he has "difficulty when he is unable to control a situation or get his needs met immediately. . . . Mr. [Z.] has been witnessed to be very loud and aggressive in nature and inappropriate. He continues to display controlling behaviors by using [the oldest child] to get to the mother." (Boldface omitted.)

The detention report also addressed the social worker's interviews with Christine and William and their criminal histories. Relevant here, Christine indicated they lived in Tijuana, Mexico, and she was in San Diego to obtain a restraining order against William,

_____

[3] The information regarding termination of services for the oldest child is from county counsel's request for judicial notice to the juvenile court, as the Agency does not directly address this matter in its detention report. Although the minute order on which the county relies does not explicitly address services, we construe the order's ruling taking the family maintenance review off calendar as resulting in a termination of services.

3

while William reported he had a drink a few nights before.[4] The criminal history reflected William was arrested for battery on a spouse or ex-spouse in September 2014; it noted this was "Detention Only," but provided no additional details regarding this incident. (Boldface omitted.) The report recommended the parents participate in structured anger management classes and alcohol treatment, among other services, but also informed the court that reunification services might not be offered to William.

Christine's restraining order application, which she filed in family court in April 2015 (prior to the dependency petition), included a statement in which she detailed alleged abuse by William. She indicated they began dating in November 2013 and he became physically and emotionally abusive after her older daughter, R.J., was born in January 2014. She described three incidents. In May 2014, William arrived home drunk late at night and wanted her to cook, making her upset. William became mad at her for being upset, dumped water from the mop bucket over her head, and hit her three times on the arms and torso with a hot plate. In February 2015, they had an argument while Christine was holding Aurora in her lap, during which William slapped Christine several times, punched her, and pulled her hair, and one of the hits grazed Aurora. In March 2015, they had another argument, and William slapped and strangled her. After Christine ended up in Shawn's apartment with Aurora, William "smashed his fist through the window of the room where the baby was sleeping, cutting his arm very badly" and threw

---

[4]    The juvenile court was aware of a potential jurisdictional issue under the Uniform Child Custody Jurisdiction and Enforcement Act, contacted Mexico to assess whether it wished to take jurisdiction, and confirmed the juvenile court had jurisdiction.

pieces of glass at Christine and Shawn. William subsequently kicked Christine in the stomach. Christine believed William did not accept she wanted to be with Shawn and stated he "increased the abuse and violence and threats against me and against Shawn over the past few weeks." The family court issued a temporary restraining order (TRO). At the detention hearing, the juvenile court replaced the family court TRO with a juvenile court TRO.

The jurisdiction/disposition report, prepared by social worker Julia Diaz, contained additional information from Christine and William. Christine informed Diaz about the incident during which William struck her while Aurora was in her arms. She stated that although Aurora was hit only once, William had struck Christine several times while she was holding Aurora. She also discussed the window incident, noting glass fell "all over and around" Aurora and that William took a glass shard and threatened her, Shawn, and himself. Diaz spoke with Christine's parents as well. They reported William called and harassed them, and Christine's father stated William was a chronic alcoholic.

William felt he did not need any services, other than housing through St. Vincent de Paul (St. Vincent's), a homeless shelter and services organization. He did not want to return to domestic violence classes and did not feel he should have to. William also reported he was sober. He explained he still drank, but considered himself a social drinker and only had about two beers at a time. He noted the substance abuse program he completed told child welfare services he was not an alcoholic. Diaz contacted St. Vincent's and a therapist informed her William appeared very disorganized in his thoughts during an intake interview. The therapist explained William struggled with

5

personal issues, had been suspended on multiple occasions from the program, and had been discharged for noncompliance. She also reported a note from November 2014 that William was demonstrating "acute signs of drug and alcohol dependency" and that he had a domestic dispute with Christine in December 2014.

The report found the parents had not learned from previous mistakes and placed Aurora at risk, noting little to no effort had been made to remove her from domestic violence situations. It recommended William receive six months of reunification services.

In May 2015, the court held an initial jurisdiction/disposition hearing, during which it addressed the TRO, among other matters. Christine requested the TRO be extended, but would consider dropping it to a no-contact order if William did not contact her before the next hearing. She stated he had been using friends to try to reach her and called her repeatedly from a restricted number late into the night (which she knew because she answered one of the calls the previous night). William denied contacting her, noting he had been in Mexico all night the previous night, had been without a phone, and just received a replacement phone the day prior. The court extended the TRO. It also noted William was contemplating a restraining order and imposed a no-contact order on Christine.

In June 2015, the Agency amended the petition to add a count under section 300, subdivision (b), alleging Aurora had been exposed to violent confrontations between the parents, including William hitting Christine while she held Aurora and William breaking the window. At a settlement conference the following day, the juvenile court observed

6

the parties were not proceeding with the restraining order requests, dissolved the TRO, and imposed a no-contact order.

In July 2015, the Agency prepared an addendum report. Christine indicated William was harassing and following her, and she felt afraid of him. William had begun weekly therapy. The Agency now recommended William not receive services. It felt that considering the amended petition adding domestic violence in Aurora's presence, there was little to no benefit in reunification services. It noted William's other children were removed under the same circumstances and found that, although he completed services a year prior and was enrolled in and compliant with therapy now, he had not shown progress and continued to display the same tendencies and put his children at risk.

The juvenile court held the contested adjudication and disposition hearing in late July. It entered into evidence the Agency's reports, the Agency's request for judicial notice for the prior dependency proceedings, and Christine's TRO statement. Christine, William, and social worker Diaz all testified.

Christine testified, consistent with her TRO statement, that the domestic violence began in January 2014 after R.J.'s birth. R.J.'s alleged father wanted to see her, but William had told people he was the father and when he found out, "he went berserk . . . ." When she tried to discuss the situation, William "started getting very violent, screaming, calling names" and hitting her with his hand two or three times. There were additional incidents, at first every other week and progressing to almost every other day by March 2014, involving William "hitting, throwing things, . . . threatening to throw me down the

7

stairs, things like that." The situation continued while she was pregnant with Aurora, including the incident at St. Vincent's.

When Aurora was born, there was no violence at first, but it started again approximately two weeks later. It began small, with William grabbing Christine and "twisting her [arm] a little bit," and then grew worse. He would barricade her in the apartment and strike her unless she said or did something he wanted; this involved hair pulling, strangling and hitting and "[m]ost of it" occurred while she was holding Aurora. Christine also recounted the window incident, again claiming William threw the shards and noting this occurred while she was holding Aurora. She stated that at other times he would throw coffee, dirty water, or anything he could find, including his coffee mug at one point. William still tried to contact her after Aurora's dependency proceeding began, including through her friends. She provided additional details on his calls, claiming he had called her 57 times from mid-afternoon until late night (and sounded drunk the one time she picked up the phone) and recounting an incident where he followed her on a bus and she felt he called her three times from the private number. The last time he had contacted her was shortly before she changed her number. She testified she was afraid of him, did not feel the no-contact order kept her safe, and desired a restraining order.

William acknowledged he was upset following R.J.'s birth, but denied striking Christine. He recalled the window incident, but stated he did not hit Christine at that time (although he did hit Shawn). He also denied trying to reach her or making 57 phone calls and said he had no problem obeying the order not to contact her. William was aware St. Vincent's staff expressed concerns about substance abuse, but said they were talking

8

about his past record and maintained he had been sober since November 5. He had not seen the substance abuse specialist at the court, but stated "I do still work my program, I go to the meetings every once in a while and I do what I have to do." In response to county counsel's request for him to state the 12 steps, he indicated "I kind of don't follow all 12 steps because it is why I drank. I do know why I drank when I drank" and stated he did not know the steps verbatim. William also testified he was living at St. Vincent's and "prearranged" for their aftercare program (involving "[g]oing to meetings, better[ing] your life, . . . focus[ing] on why you drink and why you did the stuff that you do"), participating in counseling, enrolled in parenting courses, and attending an annual veterans' services program. He stated if the court ordered him into a domestic violence class, he would be willing to take it.

Social worker Diaz testified Christine informed her four or five times that William was contacting her and that she sounded very fearful. She never saw William call Christine, but found William seemed to be very focused on Christine and she had concerns regarding Christine's safety with him. Although St. Vincent's did not have concerns about William having current substance abuse issues, "because of his past, there was concern that there could possibly be." She confirmed the comment about him being disorganized in his thoughts, but clarified they did not tell her he smelled of alcohol.

The juvenile court found reunification services were not warranted for William under section 361.5, subdivision (b)(10) and (11), because his parental rights were terminated in the previous matter and the court could not find he "made a reasonable effort, and the standard is a reasonable effort to treat the problems that led to removal." It

9

observed the problems leading to the first removal were domestic violence and alcoholism. The court noted the prior proceeding lasted through March 2015, and there was domestic violence between William and Christine "right up and past" March 2015. The court stated "[i]f you learned anything, it should have been there in your behavior and apparently it wasn't." The court also identified substance abuse as a continuing problem, citing the account from St. Vincent's, questioning whether William actually was in regular treatment and had been sober since November, and stating it did not "have any contrary evidence that [it] found very credible today." The court found reunification services appeared to be something William "cannot take advantage of and that [he had] not availed [himself] of successfully in the past" and noted if he "benefited from the services from [his] other four kids, knowing how to take care of an infant should have been one of them . . . ." William appealed.

## DISCUSSION

The sole issue on appeal is whether the trial court erred in denying William reunification services.

A. *Legal Principles*

"On removal of a child from parental custody, the juvenile court generally must order reunification services to assist the parent to rectify the problems that led to removal. [Citations.] 'This requirement implements the law's strong preference for maintaining the family relationship if at all possible.' " (*In re Lana S.* (2012) 207 Cal.App.4th 94, 106.) However, section 361.5 authorizes the juvenile court to deny a parent reunification services if it finds, by clear and convincing evidence, either that the court terminated

10

reunification services for a sibling or half sibling because the parent failed to reunify with the sibling or half sibling after the child's removal (§ 361.5, subd. (b)(10)), or that the parent's rights over a sibling or half sibling were terminated (*id.*, subd. (b)(11)) and, in either case, the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling . . . ." (*Id.*, subd. (b)(10) & (11).)

In evaluating whether a parent has made a reasonable effort to treat the problems that led to removal of the sibling or half sibling, the court focuses on the extent of the parent's efforts, not whether he or she has attained "a certain level of progress." (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 99 (*Cheryl P.*).) "The 'reasonable effort to treat' standard 'is not synonymous with "cure." ' [Citation.] The statute provides a 'parent who has worked toward correcting his or her problems an opportunity to have that fact taken into consideration in subsequent proceedings.' [Citation.] To be reasonable, the parent's efforts must be more than 'lackadaisical or half-hearted.' " (*K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, 1393.)

However, the term " 'reasonable effort' " in section 361.5, subdivision (b)(10) and (11), does not "mean that *any* effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort . . . ." (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914 (*R.T.*).) The court may "consider the *duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of

11

progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made." (*Ibid.*) Thus, "although success alone is not the sole measure of reasonableness, the *measure* of success achieved is properly considered a factor in the juvenile court's determination of whether an effort qualifies as reasonable." (*Id.* at p. 915.)

B. *Standard of Review*

We review an order denying reunification services for substantial evidence. (*Cheryl P.*, *supra*, 139 Cal.App.4th at p. 96; *R.T.*, *supra*, 202 Cal.App.4th at p. 914.) Our " 'power . . . begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible.' " (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 600 (*Francisco G.*).) The appellant "has the burden of showing the finding or order is not supported by substantial evidence." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

C. *Analysis*

Substantial evidence supports the order denying reunification services to William. The first element of section 361.5 is satisfied, as it is undisputed William did not reunify with Aurora's half siblings and his parental rights over them were terminated. With respect to the second element, the juvenile court found William did not make reasonable efforts to address the problems that led to their removal and, as discussed *post*, the record supports this finding. William contends the court misunderstood this inquiry by focusing

12

on his success at treating his problems and that there was no substantial evidence to support the court's finding.

The juvenile court properly focused on William's efforts. After correctly describing the standard as a "reasonable effort to treat the problems that led to [the prior] removal," the court identified those problems and discussed William's ongoing issues with them. Its comments about William's lack of success or benefit from the prior services were not improper. A court is permitted to consider progress to the extent it reflects whether the efforts (or lack thereof) were reasonable. (*R.T.*, *supra*, 202 Cal.App.4th at p. 914.) For example, William's domestic violence issues continued after he did not reunify or retain parental rights with the older children, yet he did not seek further treatment (and even denied he needed to), reflecting an absence of reasonable efforts. William's reliance on *Cheryl P.* is misplaced. There, unlike here, the juvenile court did not make a finding on reasonable efforts at all, instead denying services based on the parents' failure to eliminate their problems after previous services and its view that more services would be pointless. (*Cheryl P.*, *supra*, 139 Cal.App.4th at p. 97.) William's claim that the court did not discuss "any of [his] efforts" is both inaccurate (the court specifically noted its doubts that he was in regular treatment for substance abuse) and unpersuasive. He identifies no authority to establish the court is required to discuss the facts underlying its findings and we review for substantial evidence. (*Id.* at p. 96 [review is for substantial evidence].)

We find substantial evidence supports the juvenile court's conclusion that William did not make reasonable efforts to treat the problems at issue. Domestic violence was the

13

basis for the Agency's petition with respect to William's older children, is one of the grounds in the amended petition for Aurora, and is an ongoing issue for him.[5] Although he completed a domestic violence program during the prior case, there is no evidence he otherwise sought treatment for his continuing difficulties with domestic violence subsequent to the termination of services and/or parental rights in that case. (§ 361.5, subd. (b)(10) & (11).) Even after Christine obtained a TRO, he tried to contact her. Meanwhile, William told Diaz he did not feel he needed more domestic violence treatment and did not want to attend (although he stated at the disposition hearing he would do so, if ordered by the court). His subsequent efforts to address domestic violence were not simply " 'lackadaisical or half-hearted' "; they were virtually nonexistent. (*K.C. v. Superior Court*, *supra*, 182 Cal.App.4th at p. 1393; see also *R.T.*, *supra*, 202 Cal.App.4th at p. 915 [finding "no evidence that mother made any effort" to address issues following prior completion of program and return of minor, until minor was removed again and bypass of services was recommended], italics omitted; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."].)

William contends his reasonable efforts are evidenced not only by completion of services in the prior case, including a domestic violence program, but also his residence at St. Vincent's and use of its programs, participation in counseling, and enrollment in

5    William disputes Christine's recollections in certain respects, but the court credited her testimony and we will not disturb its findings in this regard. (*A.A. v. Superior Court* (2012) 209 Cal.App.4th 237, 242 [on substantial evidence review, "[w]e do not reweigh the evidence or make credibility determinations"].)

14

parenting classes. William's completion of the prior domestic violence program is of limited relevance, because the inquiry considers his efforts *subsequent* to termination of services (which occurred in March and July 2014) and/or termination of parental rights (which occurred March 2015).[6] (§ 361.5, subd. (b)(10) & (11).) Even assuming it were relevant, the domestic violence continued and there is no evidence he sought further treatment. As for the current programs, it appears he only recently commenced counseling and had not started the parenting classes. Moreover, he does not identify what specific treatment, if any, these programs provide for domestic violence. To the extent they represent William's subsequent efforts to treat domestic violence, they are not reasonable ones. (See *R.T.*, *supra*, 202 Cal.App.4th at p. 914 [confirming "*any* effort" is not necessarily a reasonable one, and noting a court may consider duration, extent, and context], see also *id.* at p. 915 ["[T]he juvenile court properly could conclude this recent effort, even assuming the effort were substantiated, was simply too little, too late."]; *Francisco G.*, *supra*, 91 Cal.App.4th at p. 601 ["In light of the prior history, father's recent efforts simply came too late."].)

William again attempts to rely on *Cheryl P.*, *supra*, 139 Cal.App.4th at page 98, as well as *In re Albert T*. (2006) 144 Cal.App.4th 207, 210, but neither supports his position.

_____

6    This is not, as William suggests, a situation in which termination in the prior case and disposition in the current one are simultaneous, so that the juvenile court may look to earlier efforts. (Cf. *Cheryl P., supra,* 139 Cal.App.4th at p. 98 [finding its ruling regarding reasonable efforts "unavoidably rest[ed] on the premise that when a case involves the almost simultaneous termination of services in the sibling's case and the denial of services at the child's dispositional hearing, the statutory language 'has not subsequently made a reasonable effort to treat the problems' (citation), refers to reasonable efforts made since the removal of the sibling"], italics omitted.)

*Cheryl P.* found a trier of fact could not reasonably conclude the parents' efforts were not reasonable; here, in contrast, there was substantial evidence to support the court's findings. (See *Cheryl P.*, at p. 98.) In *In re Albert T.*, which involved domestic violence, the juvenile court denied services, despite having little or no evidence before it regarding the mother's subsequent reasonable efforts. (See *In re Albert T.*, at pp. 219-220.) Relying on her prior completion of programs, the reviewing court found insufficient evidence to support the juvenile court's ruling. Here, even assuming William's prior domestic violence program were relevant, there was substantial evidence before the juvenile court that he did not make reasonable efforts to address his continuing domestic violence issues.

The juvenile court identified alcoholism as a second problem leading to removal in the prior dependency case. Although the Agency's petitions in that case omit mention of this issue, the record reflects William's case plan involved substance abuse treatment. (See *In re Lana S.*, *supra*, 207 Cal.App.4th at p. 108 [construing the term " 'problems that led to removal' " to include drug abuse, although it was not in the petition, where, among other things, it was a "substantial component" of the parent's service plan].) The record also reflects William continued to drink, at least socially, and that his subsequent efforts at treatment were limited to, if anything, occasional attendance at meetings and "work[ing] [his] program."[7] Further, although it is unclear whether the goal of William's

_____

[7]    William's attempt to rely on counseling and other programs appeared to be in the context of domestic violence. To the extent he seeks to rely on those programs with

16

prior substance abuse treatment was sobriety, his statements reflect he may not understand the concept (given he maintains he is sober, while acknowledging he drinks). These sporadic and limited efforts are qualitatively and quantitatively insufficient to show William made a reasonable effort to treat his alcohol problems. (See *R.T.*, *supra*, 202 Cal.App.4th at p. 914; see also *Francisco G.*, *supra*, 91 Cal.App.4th at p. 601 [father failed to take reasonable steps to address mother's substance abuse where, among other things "[a]lthough father claimed to have been attending (Alcoholics Anonymous) for years, he did not know any of the program steps, and he had only recently begun attending sessions at Fenix Services at the behest of his attorney"].)

We conclude substantial evidence supports the court's determination that William did not make reasonable efforts to treat the problems that led to removal of Aurora's half siblings in the prior dependency proceedings. (§ 361.5, subd. (b)(10) & (11).)

DISPOSITION

The order is affirmed.

MCDONALD, J.

WE CONCUR:

MCCONNELL, P. J.

BENKE, J.

respect to alcohol, the evidence is deficient for the same reasons. (See discussion *ante*; *R.T.*, *supra*, 202 Cal.App.4th at p. 914.)