Filed 12/30/20  In re A.G. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.G. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E075211 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ115183) |
| v. | OPINION |
| E.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Matthew C. Perantoni, Judge. Affirmed.

Clare M. Lemon, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, and James E. Brown, Anna M. Marchand, and Prabhath D. Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

E.B. (mother) appeals the juvenile court's dispositional order removing her two youngest children from her custody and denying reunification services under the bypass provision in Welfare and Institutions Code section 361.5, subdivision (b)(10). As we explain below, we find no error and affirm.

I

FACTS

A. *Child Welfare History*

Mother is a single parent with five children: a 17-year-old daughter A.B., twin 13-year-old sons C.E. and C.Z., a six-year-old daughter A.G., and a five-year-old son J.G.[1] A.B.'s father is Eduardo G., the twins' father is Clarence D., and A.G. and J.G.'s father is Jonathan G. This appeal concerns the two youngest children, A.G. and J.G.

Mother has an extensive but mostly minor criminal history from 2006-2009, which includes convictions for driving under the influence, driving with a suspended license, providing false identification to a police officer, and vandalism with damage greater than $400. She also has two violent crime convictions for assault with a deadly weapon and misdemeanor battery.

The family has a history with child welfare services. In September 2007, Riverside County Department of Public Social Services (the department) filed a Welfare and Institutions Code section 300 petition as to A.B., C.E., and C.Z. based on domestic

---

[1] Because the twins share the same first and last names, we refer to them by their first and middle initials.

violence concerns. (Welf. & Inst. Code, § 300, unlabeled statutory citations refer to this code.) The court ordered that mother be provided family maintenance services.

In July 2008, the department received a referral alleging mother was generally neglectful and was an absent or incapacitated caretaker. It had been reported that mother was arrested for aggravated mayhem after she allegedly " 'slash[ed]' " a woman. The department found the allegations in the referral substantiated, placed A.B., C.E., and C.Z. into protective custody, and filed a section 387 petition making the same allegations. The court found the petition stated a prima facie case and ordered family reunification services for the parents. The same month, mother was charged with four counts of assault with a deadly weapon. The court eventually terminated mother's services at the 18-month status review hearing, held in February 2010. The court appointed father Clarence D. the legal guardian for A.B., C.E., and C.Z. The court terminated the dependency as to those three children in November 2010 while mother was incarcerated for assault with a deadly weapon.

In August 2011, mother was convicted of assault with a deadly weapon and sentenced to seven years. She was released in December 2012 and discharged from parole two years later.

Mother unsuccessfully attempted to terminate the legal guardianship as to all three children in 2014, and as to A.B. alone in 2018. In January 2019, she successfully terminated the legal guardianship as to A.B., and received sole physical and legal custody.

3

B.    *Facts Leading to the Current Petition*

On September 25, 2019, the department received a referral alleging A.B. was refusing to go home after school because she feared mother would physically assault her. The referral also alleged mother physically abused A.B. a couple of months prior. The next day the department received another referral reporting mother had shown up at A.B.'s high school and harassed her, calling her names and hitting her repeatedly. A.B. was released to her father, Eduardo G. The following day the department received yet another referral, reporting A.B. had a fat lip, a cut on her neck, a cut on her arm, and a cut on her gums from mother's attack. The department was able to retrieve a video of mother's abuse that showed her chasing A.B., grabbing her hair, dragging her by the hair, and punching and slapping her in the face until school officials intervened.

A social worker interviewed A.B. after the incident on October 1, 2019. A.B. said her boyfriend assaulted her two weeks prior to the altercation with mother. She reported that incident to school staff, who reported it to mother. Mother told A.B. not to speak to the boyfriend, but A.B. had to speak to him as part of the school's conflict resolution procedures. When mother found out about this contact, she began sending A.B. text messages saying she was going to beat her. According to A.B., mother showed up at the school unannounced, chased her down, hit her, and called her names. A.B. also told the social worker that she wasn't sure whether her siblings were safe with mother because mother could not control her own behavior.

A.B. reported earlier incidents of abuse. She said mother slapped and hit her as discipline four to six times and that one of these incidents prompted a grandmother to intervene and stop mother. She said mother also hits and slaps A.G. and J.G. to discipline them.

The same day, the social worker visited mother's home unannounced. Mother told the worker " 'everything's fine' " multiple times and denied requests to enter the home or speak to J.G. and A.G. She refused to explain the reason for the incident, or acknowledge it was a concern. Mother said A.B. was at her father's and was having a fit and needed to cool down. Later that day, mother told the social worker over the phone that A.B.'s " 'teenage feelings are hurt,' " and claimed A.B. wanted to return to her care.

On October 2, 2019, the social worker contacted father Jonathan G. He said mother was physically aggressive with him and would slap and verbally berate him while the children were present. He also claimed mother had been arrested for domestic violence in 2014. He confirmed mother occasionally slapped A.B., A.G., and J.G. as discipline. He also confirmed she used derogatory slurs against A.B., repeatedly calling her a " 'bitch' " or a " 'slut.' "

Later that day, the department took A.B., A.G., and J.G. into protective custody. It filed petitions under section 300, subdivisions (a) and (b) as to A.B. and subdivisions (b), (g), and (j) as to A.G. and J.G. As relevant here, the petitions alleged mother physically and verbally abused A.B. and that there was a substantial risk A.G. and J.G. would suffer similar harm.

The social worker spoke to A.G. and J.G. separately once they were in protective custody. The social worker asked J.G. what happens when he gets in trouble, and he responded " 'Mom said don't tell you guys sorry.' " He eventually admitted he gets spanked on the butt, and that sometimes mother will " 'hold his hair.' " He said he witnessed the incident between A.B. and mother at the school. He denied seeing mother hit any of his siblings, but also reiterated that " 'mommy told not to tell you what her do to us [*sic*].' "

A.G. told the social worker "mommy told us not to say a word about what she does to us." She said mother hits her on her butt and arms as discipline. She also said mother and Jonathan G. yell at each other often and don't get along. She said mother had slapped Jonathan G., hit him in the face, and hit him with a phone charging cord. A.G. also said she witnessed the incident between mother and A.B. at A.B.'s school. She said mother would swear at her and J.G. When asked whether she was scared of mother, she said " 'yeah, I mean no,' " and added that she was mostly scared when mother hit Jonathan G.

Later, while together in the car, A.G. and J.G. said mother told them the social worker was " 'bad people' " and they shouldn't talk to her. The social worker asked again if they ever saw mother slap A.B. A.G. said no, but J.G. said he had and begged the social worker to believe him over his sister because she was only saying what mother told them to say. J.G. said mother slapped him twice, and A.G. said mother would spank her with a belt. Both children said mother slapped the twins.

6

On October 3, 2019, mother told the department she was willing to give up custody of A.B. if the younger two children were returned to her. The next day, the department amended the petitions to add allegations that mother and Jonathan G. engaged in domestic violence in the children's presence.

On October 7, 2019, the court found A.B., A.G., and J.G. fell within section 300 and detained them from mother. It also issued a temporary restraining order protecting A.B., Eduardo G., and Eduardo G.'s family from mother.

C.      *Jurisdiction and Disposition*

Between the detention hearing and the jurisdiction and disposition hearing on October 29, the department conducted further interviews with the parents, children, and school officials. The information given in these interviews was consistent with the information from previous interviews. This included A.G. and J.G. reiterating that mother would hit A.B. and Jonathan G. and tell them not to say anything to social workers. A.G. and J.G. exhibited aggressive behavior with each other. Mother was not allowed visitation with A.B.  There were also concerns mother was whispering instructions and details of the case to A.G. and J.G. while playing.

Mother continued to deny any pattern of physical or verbal abuse between her and A.B. and specifically denied assaulting her daughter at school. She said she was the victim of domestic violence from Eduardo G., not the perpetrator. She denied disciplining her children using anything more than time outs and spanking. She said she didn't believe she needed any drug testing, counseling, substance abuse treatment, or domestic violence

7

courses. She said "she is willing to do whatever she needs to do to reunify with [A.G.] and [J.G.], [but] she has no interest in reunifying with [A.B.]."

Jonathan G. expressed concern that returning A.G. and J.G. to mother was especially dangerous now because the department's involvement had made her angry and she "takes 'her anger out on the people closest to her.' " He said he'd seen mother hit J.G. and A.G. with an open hand on the butt and thigh. He said the hitting was excessive and mother didn't know when to stop.

The department also found that police had contact with mother's family six times between April 2014 and August 2019, which didn't count the September incident at school. Most of these calls concerned alleged or feared domestic violence between mother and Jonathan G.

Mother began attending anger management, domestic violence, and parenting classes in late October 2019, and by all accounts was actively participating in those services.

On December 5, 2019, mother was arrested for the September school incident with A.B. She was charged with felony willful child cruelty, pleaded not guilty, made bail, and was released from custody the same day.

The court held a contested jurisdiction hearing on December 10, 2019. It found the allegations in the petition true and concluded A.G. and J.G. fell within section 300, subdivision (b)(1). It adjudged them dependents and set a contested disposition hearing for January 9, 2020.

8

The department filed an additional report prior to the hearing on January 9, 2020. By that time, mother had completed a nine-week parenting class and was in the process of completing a 12-week anger management class. During an unannounced home visit on January 7, mother explained she still didn't want to try reunifying with A.B. because she felt she would be " 'walking on egg shells' " around her daughter. However, she said she was no longer angry at A.B. Mother's clinical therapist stated that mother added input in discussions and that " 'her personal growth is clinically encouraging.' "

At the hearing on January 9, 2020, the court continued the contested disposition hearing as to A.G. and J.G., but removed A.B. and placed her with her father Eduardo G. Mother subsequently completed her 16-week anger management class.

The court held the final contested disposition hearing as to A.G. and J.G. on February 27, 2020. Mother requested reunification services, argued she was benefiting from the classes she was taking, and submitted letters from a therapist and group facilitator corroborating that her participation in those services was regular and engaged.

The court removed A.G. and J.G. from mother's custody and denied her reunification services under section 361.5, subdivision (b)(10). Mother timely appealed the court's dispositional order.

## II

## ANALYSIS

Mother argues there is insufficient evidence to support the court's conclusion that the bypass provision in section 361.5, subdivision (b)(10), applies to her. In the

alternative, she argues the trial court abused its discretion by not ordering reunification services for her as to A.G. and J.G.

## A. The Court Properly Applied the Bypass Provision

Once a court has decided to remove a child or children, it must order family reunification services "unless [it] finds by clear and convincing evidence that one of the 15 exceptions set forth in section 361.5, subdivision (b), applies." (*In re Albert T.* (2006) 144 Cal.App.4th 207, 217 (*Albert T.*).) The exception at issue here, codified in section 361.5, subdivision (b)(10), allows the court to bypass reunification services if " 'the court ordered termination of reunification services for any siblings or half-siblings of the child because the parent or guardian failed to reunify with the sibling or half-sibling . . . and that, according to the findings of the court, this parent or guardian has not *subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half-sibling*.' " (*Albert T.*, at p. 217, italics added.) For the exception to apply, "the juvenile court must find both that (1) the parent previously failed to reunify with a sibling and (2) the parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling." (*Id.* at p. 217.)

"We review the court's dispositional findings for substantial evidence." (*In re T.V.* (2013) 217 Cal.App.4th 126, 136.) " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the

findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' "(*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Here, it's undisputed that the court previously terminated mother's reunification services for three of A.G. and J.G.'s siblings and that mother failed to reunite with all three children. Therefore, the only question we face is whether substantial evidence supports the juvenile court's finding that mother "has not subsequently made a reasonable effort to treat the problems that led to" the removal of those siblings. (*Albert T.*, *supra*, 144 Cal.App.4th at p. 217.)

On this record, the court could reasonably conclude mother had not done so. The root cause of the 2007 dependency was mother's violent and abusive behavior. When she ultimately failed to reunify with A.B. and the twins in 2010, she had received approximately 29 combined months of services: 10 months of family maintenance services from September 2007 to July 2008, and 19 months of family reunification services from July 2008 to February 2010. A significant factor in her failure to reunify was her incarceration for assault with a deadly weapon, a violent crime.

Despite this past, the root cause of the current dependency was also mother's issues with domestic violence and abusive behavior towards her family. A.G., J.G., A.B., and Jonathan G. all reported she was the aggressor in multiple domestic violence incidents with the children present. All the children reported she used harsh disciplinary measures against them, and there is video and testimonial evidence of her assaulting A.B.

11

in public. These incidents demonstrate that mother did not correct her violent behavior and continued to engage in it around and towards both her children and her intimate partners in the years between losing custody of the twins and the opening of the current case.

Nevertheless, mother argues she has since demonstrated a reasonable effort to resolve these issues by completing several courses during this dependency case. She points to evidence from the people running those programs and services suggesting she is making "clinically encouraging" progress as evidence that she is making reasonable efforts. She argues she is succeeding in these services and succeeding at correcting her behavior, which is more than the law requires since "the question is not whether mother is succeeding in treating her issues—it is whether she is trying."

Mother may very well be benefiting from these services, but on this record the trial court could reasonably view her recent efforts as too little, too late. The inquiry under section 361.5 subdivision (b)(10), is whether she made a reasonable effort to remedy the behavior that led to removal between then and the initiation of the current dependency, such that we should treat any new case as new rather than just another manifestation of the same underlying issues. The requirement that a parent make reasonable efforts is not an inducement to start acting right only after you get caught, it's "a means of mitigating an otherwise harsh rule that would allow the court to deny services simply on a finding that services had been terminated as to an earlier child when

the parent had in fact, *in the meantime*, worked toward correcting the underlying problems." (*In re Harmony B.* (2005) 125 Cal.App.4th 831, 842, italics added.)

Here, even accounting for mother's most recent improvements, the juvenile court could properly conclude that she did not make a reasonable effort to improve. In her first dependency case, she received nearly two and a half years of services. Despite that, she continued to engage in domestic violence, both against Jonathan G. and her own children, once released from prison. Police were called to her home six times between 2014 and 2019, each time concerning possible domestic violence. This culminated in her attacking A.B., and afterwards insisting that the incident wasn't that serious and that A.B. was overreacting. All of these behaviors point to mother failing to make reasonable efforts to identify and correct her propensity for violent behavior between 2010 and September 2019.

This case is thus distinguishable from *Albert T.*, *supra*, 144 Cal.App.4th 207 and *Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87 (*Cheryl P.*), both of which mother cites as support for her position. Those cases involved parents who were actively and seriously trying to address the issues that resulted in removal, but who were unfortunately not making much progress. In *Cheryl P.*, the parents suffered from cognitive and mental health issues which made it difficult for them to benefit from reunification services. But despite those difficulties, they continuously demonstrated a commitment to improving. (*Cheryl P.*, at pp. 91-95.) In *Albert T.*, the mother fully participated in domestic violence counseling throughout her first dependency case and

even thereafter, but nevertheless continued to enter into relationships with abusive men (where, notably, she was the victim of domestic violence, not the perpetrator). (*Albert T.*, at p. 221.) The parents in these cases demonstrated a *constant* commitment to improving even as their actual progress left much to be desired. And, unlike mother, the parents in those cases were not a direct threat to their children.

Here, the record contains no evidence that mother participated in any services to address her violence issues in the time between the termination of her previous services and the filing of this case. Mother does not claim she participated in any treatment or classes between her failure to reunify with A.G. and J.G.'s siblings and the initiation of this case. In short, there is no evidence she made any attempt to correct the issues that led to the removal of A.B. and the twins until after the department initiated this case. We therefore conclude that substantial evidence supports the court's decision to apply the bypass provision.

B. Denial of Reunification Services

In the alternative, mother argues the juvenile court abused its discretion in refusing to order reunification services. "Section 361.5(b)(10) does not require the juvenile court to deny reunification services, but merely gives it the authority to do so. [Citation.] If the court finds by clear and convincing evidence that reunification is in the best interest of the child, it retains authority to order a further round of reunification services." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) "The burden is on the parent to show that reunification would serve the best interests of the child." (*In re S.B.* (2013) 222

Cal.App.4th 612, 623 (*S.B.*).) "A juvenile court has broad discretion when determining whether further reunification services would be in the best interests of the child under section 361.5, subdivision (c). [Citation.] An appellate court will reverse that determination only if the juvenile court abuses its discretion." (*In re William B.* (2008) 163 Cal.App.4th 1220, 1229.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 (*Stephanie M.*).) Thus, a juvenile court abuses its discretion when its ultimate decision is not supported by substantial evidence (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141) or " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*Stephanie M.*, at p. 318.)

"A court called upon to determine whether reunification would be in the child's best interest may consider a parent's current efforts and fitness as well as the parent's history. [Citation.] Additional factors for the juvenile court to consider when determining whether a child's best interest will be served by pursuing reunification include the gravity of the problem that led to the dependency; the strength of the relative bonds between the child and both the parent and caretakers; and the child's need for stability and continuity, which is of paramount concern." (*S.B.*, *supra*, 222 Cal.App.4th at pp. 622-623.) Section 361.5, subdivision (c)(4), also states that a court should take into consideration "[t]he failure of the parent to respond to previous services," and "a past history of violent

15

behavior," when considering whether to extend reunification services despite finding it has the authority to bypass them.

The court did not abuse its discretion here. It is mother's burden to demonstrate that reunification services would be in A.G. and J.G.'s best interest. Her evidence in this regard is that she has been improving since October 2019 when she started participating in services and that she and the children share a bond. However, the evidence against reunification being in their best interest is fairly clear. The record contains evidence mother has been physically violent towards at least one child in the very recent past and has a history of being violent with her partners. There is some evidence to conclude she also implements violent discipline against A.G. and J.G. Moreover, nearly 29 months of services in her previous dependency case failed to remedy many of these issues. Given these considerations, the court's decision to deny reunification services was not arbitrary or capricious and was supported by substantial evidence.

## III

## DISPOSITION

We affirm.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
                                                                J.

We concur:

RAMIREZ
            P. J.

RAPHAEL
        J.

16